## THE PEOPLE vs. RATHBUN.

The *uttering and publishing* a promissory note with *forged endorsements* upon it, is an offence within the statute against forgery, although the passing of the note is accompanied with communications which would exonerate the endorsers if the endorsements were genuine ; if by possibility the endorsers *may* be injured, the crime is perpetrated.

The crime of *uttering and publishing* is not complete until the paper is transferred and comes to the hands or possession of some person other than the felon, his agent or servant ; thus where a note with forged endorsements is sent by the felon per mail from one *county* to an individual in *another county*, for the purpose of obtaining credit upon it, the crime is not consummated until the note is received by the person to whom it was sent ; and the *proper place of trial* is the county to which the note was sent.

In respect to *misdemeanors*, where part of the offence is committed in one county and part in another, the rule of law in respect to the *venue* is otherwise ; then the trial may be had in either county.

On a charge of *uttering and publishing* a promissory note with the names of several persons upon it as endorsers, all which endorsements are alleged to be forged, it is not necessary for the purpose of sustaining the indictment to prove *all* the endorsements to be *forgeries* ; it is enough that one or more are shown to be forgeries.

*It seems*, that the *uttering* here of a *counterfeit foreign bank bill*, the circulation of which is made *illegal* by statute, would be deemed an offence within the statute, if laid to have been passed with the intent *to defraud the bank ;* though the indictment would be bad if laid to have been passed with the intent *to defraud the receiver* of the bill.

The forming and expressing an opinion by a juror upon the guilt or innocence of a party on trial for a felony, is a *principal cause of challenge ;* the mere *forming* of an opinion is enough.

Where, on a trial for felony, the prisoner by his counsel consents to substitute the *court* for *triors*, upon challenges to jurors, such consent cannot afterwards be *revoked* and a demand made that a challenge to jurors shall be passed upon by *triors*, especially after the challenge has been passed upon by the court.

A *bill of exceptions* lies for refusing triors, or upon any question arising upon a challenge to jurors, in a case where *triors* may be demanded.

It is competent, in support of a prosecution, to prove that the prisoner advised an *accomplice* to break jail and make his escape.

Evidence that the prisoner refused to escape and go beyond the reach of the process of this state, after being apprized of the charge brought against him, although he was advised to do so, and it was entirely practicable to have made his escape is inadmissible.

On the trial of an indictment, as well as of a civil action, it is competent to the judge to express his opinion to the jury *upon the weight of the evidence,*

provided that such opinion be not expressed in the form of a direction as matter of law ; whilst what is said is merely advisory, the charge will not be reviewed.

Whether a *jury* in a criminal case are concluded by the instructions of the *judge* upon *matter of law*, or whether they are the sole judges of the *law* as well as the *facts* of the case, *quære.*

Observations as to the proper matter of a *bill of exceptions* in a criminal case.

INDICTMENT for forgery. Benjamin Rathbun, the prisoner, being in the city of *New York*, enclosed in a letter directed to *David E. Evans*, of *Batavia*, in the county of Genessee, three promissory notes, of $5000 each, drawn by himself, and *purporting* to be endorsed by *eleven individuals*, to whom the notes were made payable ; desiring Mr. Evans to make and send to him three notes of similar amounts, drawn by Mr. Evans, payable to the prisoner, and to keep the notes sent to him for his indemnity. The letter, with its inclosures, was post marked at New York on 13th April, 1836, and was received by Mr. Evans at *Batavia.* The prisoner, previous to this time, had been a resident at Buffalo, and engaged in very extensive business operations. Mr. Evans made and sent his notes as requested. Subsequently it was discovered that the *endorsements* upon the notes sent to Mr. Evans were *forgeries* and at the Genessee oyer and terminer, held in October, 1836, the prisoner was indicted for the felony committed by him. The indictment contained several counts, charging the offence in different forms. The *third count*, charging the prisoner with *uttering and publishing* one of the notes, describing it as a note dated at Buffalo, on the 15th April, 1836, made by the prisoner, for the sum of $5000, payable at the Manhattan Bank, in the city of New York, four months after date, to the order of *Hiram Pratt*, and ten other individuals, and *purporting* to be *endorsed by the payees*, he knowing the endorsements to be forged, with the intent to defraud the individuals whose names appeared as endorsers. The trial came on in September, 1838, at the Genessee oyer and terminer, before the Hon. NATHAN DAYTON, one of the circuit judges, and his associates.

The People v. Rathbun.

Before calling the jurors, it was suggested by the court
that if objections were taken to jurors called, either party
had a right to have *triors* appointed to pass upon the facts,
and determine whether the jurors *were or were not indiffer-
ent ;* but *if this were not insisted on,* it would be more con-
venient and perhaps desirable, under the circumstances of
the trial, to have each juror, when called and appearing,
*sworn to answer such questions* as should be put to him re-
lative to his having formed and expressed an opinion as to
the guilt or innocence of the prisoner, of the charges upon
which he was to be tried.   No objection being made to this
proposition by counsel on either side, each juror who ap-
peared was sworn and examined as to his having formed or
expressed an opinion as to the guilt or innocence of the pri-
soner.   After the regular panel was exhausted, Elijah Grey,
who had been summoned as a talesman, being called, the
counsel for the prisoner interposed a challenge against his
sitting as a juror, on the ground that he was not an indiffer-
ent juryman, but had formed and expressed an opinion
against the innocence of the prisoner.   On being examined,
he testified that he had neither formed nor expressed an opin-
ion as to the guilt or innocence of the prisoner ; that he had
conversed but little on the subject before coming to Batavia
to court, but that he had heard some conversation in the
tavern at Batavia since he had come to court; that, in the
morning before he was summoned, some person might have
said to him that if public opinion was to prevail, Rathbun,
had he been a poor man, would have been in state's prison
long since ; that he believed such a remark was made, and
that he, Grey, might have assented that such was the public
opinion ; but that he had long since learned the impropriety
of making up an opinion on hearsay reports, and had not
made up any in this case.   The counsel for the defendant then
objected that Grey was not an impartial juryman in the cause,
and moved that *triors* should be appointed.   The court denied
the motion, and decided, that after the counsel had examined
a juryman on oath before the court without asking for triors,

it was too late to call for them, and that the defendant had waived his right to have triors appointed; that the court were then the triors. The court overruled the challenge and objection of the defendant's counsel, and decided that Grey was an indifferent juror, and he was sworn of the jury accordingly. The prisoner's counsel excepted on the two last points, upon the ground stated in the challenge and objections.

Mr. *Evans*, the individual to whom the notes were sent by the prisoner, testified that the note in question, with two others just like it, were enclosed in a letter of the prisoner, dated New York, 13th April, 1836, together with three other notes to be signed by himself and sent in exchange, which he signed and sent accordingly. The letter mentioned that the three endorsed notes (all having on them the same eleven names as endorsers with those on the note in question) *were got for a special purpose;* that for certain reasons it was desirable to change the shape of the paper, and requested Evans to lay the three notes (with many endorsers) in his private desk, and sign and remit the three blank notes, which were for the same amount. The letter stated that he had not time to make a change of such a number of endorsers; and the notes being for a specified purpose, if known to some of them that other use was made of their names, it might create some feeling. The three notes with eleven endorsers were read in evidence. *Eight* of the individuals whose names appeared as *endorsers* on the note were called as witnesses on the part of the prosecution, and proved the signatures, purporting to be subscribed by them, to be *forgeries;* and the genuineness of the endorsements of the three other payees was *negatived* by the testimony of several witnesses, who spoke from their knowledge of the hand-writing of the parties.

The participation of the prisoner in the forgery was sought to be shown by *Rathbun Allen*, who admitted that he was an accomplice, and it was sought to corroborate his testimony by a letter of the prisoner and memoranda made by him in the course of his business; the letter being dated at the city of New York, April 12, 1836, and directed to Ly-

man Rathbun, and which it was contended related to the forgery in question, or to other forgeries or attempted forgeries of other paper, shortly before or shortly after that in question was made. Allen's testimony tended to show that it was made at the Franklin House in New York, about the 12th of April, 1836. The letter and memoranda were objected to as irrelevant, but admitted, and the prisoner's counsel excepted. They contained obscure directions and allusions, which it was insisted the jury might regard, in connection with other facts, as circumstances tending to make out the *scienter*. The prisoner's explanations how forgeries had been carried on in his business were also received in evidence against him, though objected to and an exception taken. He said they began without his knowledge, and on discovering them he could not at once check their course and disembarrass himself from them. Evidence was also given on the part of the prosecution, that the prisoner advised *Rathbun Allen* the accomplice, whilst Allen was in prison, to break jail and escape : this evidence was objected to and an exception taken to its admission.

The prosecution resting, the prisoner's counsel moved the court to direct his acquittal on the third count : 1. On the ground that there was no evidence of an intent to defraud the endorsers as that count alleged ; so far from that, the very letter enclosing the notes to Evans negatived such intent. It stated substantially that the endorsements had been obtained for the prisoner's accommodation, and for a definite object ; and directions were given in the letter to divert them from that object : which, allowing the notes to be genuine, would discharge the endorsers. 2. Because the venue should have been laid in the city and county of *New York*, where the notes were mailed, and not in *Genessee*, where they were received. The court denied the motion.

The defence, as opened by the prisoner's counsel, was placed on several grounds : 1. That the names of the several endorsers were not forged. 2. If they were, the prisoner had no knowledge of their being so, he relying on his financial agent, Lyman Rathbun, to procure endorsers for him at all times, himself giving no attention to such matters. 3.

that Allen was not to be believed. Evidence was accordingly given tending to establish these propositions, and among others, the testimony of Lyman Rathbun, taken under a commission at Texas.

It had appeared that the prisoner had, in July or August, 1836, after the forgeries were imputed to him, made a general assignment of his property in trust for all his creditors; and it was proposed, in his behalf, to prove that *all his property* had been taken possession of by his assignees, which was overruled, and an exception taken.

It was also proposed to prove, that after such imputation and after the assignment of his property the prisoner was advised to escape and go beyond the reach of the process of this state, and that he refused to do so, although it was entirely practicable for him to have made his escape: but the court refused to receive the testimony; upon which another exception was taken.

The prosecution gave evidence in reply; and, among this were a series of twelve letters, part of which were written by the prisoner to Rathbun Allen, the dates ranging from the 10th of March to the 1st of April, 1836; and also letters from him to Lyman Rathbun, ranging from that date to the 19th of April, 1836. These were proposed, 1. as showing his intimate knowledge and particular supervision of his pecuniary concerns, as well before as after the 13th of April, 1836; 2. as to some of them, in order to show the defendant's knowledge that the names were forged; and 3. to corroborate the testimony of Allen. They were objected to, especially those written after the endorsements in question were made; but they were all received, and the defendant's counsel excepted.

The prosecution then introduced in evidence certain memoranda, some in ink and some in pencil, which witnesses gave their opinion were in the prisoner's hand-writing. These were objected to, as neither sufficiently proved nor relevant; but were received, and the defendant's counsel excepted.

The testimony being closed, the defendant's counsel insisted to the jury, that the three grounds of defence stated

in the opening had been sustained ; that none of the counts, save the third, could with any propriety be insisted as made out in proof; and as to that, the venue was wrong ; nor was there the least proof of an intent to defraud. The counsel also insisted that the forgery could not be regarded as proved beyond reasonable doubt, which should be removed from the mind of the jury before they could convict.

The court charged the jury, 1. That the venue was properly laid in the county of Genessee. 2. That, as to the prisoner's fraud being negatived by the instructions in his letter to Mr. Evans, the court had already expressed an opinion that the objection *was without foundation.* That the case was made out, whether the endorsers could, on genuine paper, have been made liable or not ; if Evans could not have collected the note on account of having notice, yet such a defence must depend on collateral evidence ; it not appearing on the face of the paper, which was apparently obligatory, and thus *might be* the subject of the offence charged. Such collateral matter furnished *no ground* for acquitting the defendant, whatever might be its effect in a civil suit against the endorsers. Whether the endorsements were forged was for the jury to decide, on the evidence, which the circuit judge summed up, and said among other things, that as all the supposed endorsers resided or had resided in the city of Buffalo, it would be easy to procure testimony to show the genuineness of the endorsements, if they were in truth genuine. That this had not been attempted. That to the court, the proof of the forgery *seemed* very clear ; that it was much stronger than could usually be expected in cases of this kind ; but that it belonged to the jury and not to the court, to determine whether the testimony was sufficient. As to the prisoner's knowledge : if he had the forged endorsements in his possession and uttered them as true, his knowledge should be presumed, so far as to call on him for explanation, especially as the note was signed and negotiated by him personally. The notes had been used in the defendant's business and for his benefit, and he appeared to have known that genuine endorsements on like notes of the same date were in the hands of the trust company. Here the judge adverted to various proofs showing the pri-

soner's knowledge of the financial branches of his business; and expressed the opinion of the court, that independent of R. Allen's testimony, the evidence appeared very strongly to show the prisoner's knowledge that the endorsements were forged when he passed the note. He left it to the jury to say how far Allen, the accomplice, stood corroborated by other evidence; and remarked, that if he had testified truly, his testimony went greatly to strengthen the evidence of knowledge in the prisoner. That the jury would, on the whole evidence, decide upon the question of knowledge. After remarking upon other evidence, the judge told the jury they were to make up their own opinions upon the law and fact of the case. That if, upon the whole evidence, they believed the defendant passed the note to Mr. Evans in the manner described by him, that the endorsements were forged, and the prisoner at the time knew of the forgery and uttered them as genuine, the jury *might* find him guilty under the third count in the indictment.

The counsel for the prisoner excepted to the charge in the above respects, and in several others wherein the court intimated or submitted to the jury that certain facts might aid them in drawing certain conclusions. Other exceptions denied, in many particulars, that the court had correctly apprehended the force of certain sets of facts or the force of the testimony of certain witnesses, which it appeared by the bill of exceptions to have been ascribed to such facts or testimony in the charge to the jury. Again: other exceptions de nied that certain consequences could be drawn from certain facts of the case or the testimony of certain witnesses, which did not appear in the bill of exceptions to have been even hinted at by the charge in the manner or in any connection supposed by the exceptions. The prisoner's counsel then presented five points on which they requested the court to charge the jury, the first three of which selected certain sets of facts insulated from the whole case, and desired the judge to charge whether certain inferences could be drawn from them. On the first and third the judge charged against the prisoner, and on the second refused to charge, but left the matter to the jury; and to these three decisions the prisoner's counsel also excepted.

The jury found the prisoner guilty on the third count, and acquitted him on the others. His counsel moved a suspen-sion of the sentence till there should be time to prepare the requisite papers, and take the proper steps to stay judg-ment till the opinion of the supreme court could be taken. This motion was denied, and the prisoner's counsel excepted. The prisoner was then sentenced to the state prison for the term of five years. The proceedings were brought into this court by writ of error.

*S. Stevens, & J. A. Spencer,* for the prisoner.

*Willis Hall,* (attorney general,) for the people.

By the Court, COWEN, J. I think none of the exceptions to the admission or rejection of evidence were well taken. The objections to admission were in the main professedly founded on irrelevancy, which always depends upon the ob-ject for which testimony is offered. While many times it may not be obviously relevant, when referred to the issue upon the record, it becomes quite material for the purpose of collateral issues arising in the course of the cause. The di-rect issue was the forgery and the fraudulent uttering of the note mentioned in the third count, and much of the testimony objected to tended to make out the *scienter.* This was, among other things, sought to be proved by *Rathbun Allen,* an accomplice, while it was sought to be repelled by inferences from the great extent and complication of the business of the prisoner, and his ignorance of his money matters, which were conducted by others. The jury were asked to infer that forgeries, therefore, had been mingled with his genuine paper without his knowledge, and that his negotiating such forged paper was a mere mistake. To show the *scienter,* or sustain the accomplice, or repel the inference mentioned, or to answer all three of these purposes, the letters, memoranda and declarations of the prisoner, em-braced by the exceptions, were plainly admissible.

One of the exceptions, and I do not know but more, complains that evidence tending still farther to show the ex-tent, variety and complication of debts and business, was

overruled. It is a somewhat singular ground of defence, at best, that forged paper, conducing to a man's individual and exclusive profit, has been made and mingled in his affairs by some third person. It assumes that there is a disinterestedness and generosity in crime, which, I apprehend, is without the pale of presumptive evidence. I cannot say I should have been dissatisfied had all the evidence which was proposed to fasten voluntary forgery on others been excluded. The account is more natural, as given by the accomplice, that if he forged the endorsement, it was as an instrument used by the prisoner.

The remark by the judge, that the paper or transaction purporting to be for the prisoner's benefit and operating so in fact, might be considered as weighing against him, seems to have been better in accordance with the philosophy of the human mind. Truly, a note drawn by one who passes it with forged endorsements, seems, as the judge said, not only to call for an explanation from him how that could innocently be, but a much more satisfactory explanation than was given. The doctrine was laid down much more strongly against the prisoner in *State* v. *Britt*, 3 Dev. 122, 125, by Mr. Justice Ruffin.

That the prisoner advised Allen, the accomplice, to break jail and escape, he being charged with the crime imputed by this indictment to the prisoner, might have been regarded by the jury either as indicating a desire to get him out of the way, and thus to prevent his being a witness, or as betraying a guilty knowledge of the crime which the prisoner assumed for the foundation of his advice. It is hardly to be supposed that he would interfere thus to defraud justice, without being a colleague in the guilt which the advice supposed. One of the commonest effects of a community in crime, is the undetected accomplice lending a hand for the escape of his more unfortunate associates. It is one means of escape usually looked to in a copartnership of guilt —a circumstance which more than any other renders our jails insecure.

It was offered to show that the prisoner, although advised by his assignees to escape and go beyond the reach of pro-

The People v. Rathbun.

cess, and having an opportunity to do so, declined; and it is supposed that the admissibility of such proof, follows from the rule which turns an attempt to escape against the prisoner. A strong declaration of *Hume*, in his treatise on the trial of crimes, that such a fact should be received as conclusive against any case sustained by circumstantial evidence merely, was cited. But the difference between an attempt to escape, and refusal to escape, whatever degree of moral conviction the latter might carry to the mind of the writer, is quite obvious when they are offered as legal evidence. The attempt implies guilt, and operates against the party like a confession. The refusal is an act and confession in his own favor. Once receive it, and the criminal courts will be loaded with such evidence. It is almost as easily manufactured as a declaration of innocence. The prisoner and his friend may introduce a third person to give the advice and hear the refusal, who may be a witness with perfect integrity. A dupe himself, he may testify to the fact without being guilty of perjury; and thus the practical working of Mr. Hume's rule would in effect neutralize the force of all circumstantial evidence—a species of evidence which is in general the only resort for the establishment of infamous offences, and, when received under proper caution, is at least equally satisfactory with the most positive proof. The ease with which an *alibi* is said to be got up and maintained by perjury, renders it a very suspicious kind of proof. So the art with which *insanity* may be counterfeited. But the false declaration of innocence, or subsequent acts which appear to indicate it, are too common a resort to be regarded as even admissible.

The question whether the assignees had not taken possession of the whole property of Rathbun, pressed with a view to infer his original integrity, was inadmissible for the same reason. Acts and declarations which are a part of the *res gestæ* are admissible. Thus, on a trial for a riot in destroying a threshing machine, the defendant's witness was allowed to state that he and the defendant were compelled to join the mob; but they had before agreed to run away the first chance: which they did, the witness in ten minutes,

and he being joined by the prisoner in a quarter of an hour after. *Rex* v. *Crutchley,* 5 Carr. & Payne, 133, and see the note to that case. Farther than this, the common law cases do not go. Mr. Hume wrote on the Scotch law. In *The State* v. *Scott,* 1 Hawks, 24, both the declarations and conduct of the prisoner, the next morning after the homicide, were repudiated as incompetent evidence even of insanity.

I am satisfied with the charge of the judge. The branch of the charge mainly relied on for error, is the refusal to direct an acquittal, on the ground of the advice in the letter which enclosed the note and endorsements to Mr. Evans, that they were made for a special purpose, and a request to lock them up. This advice, and this request, it is said, absolutely negatives all fraudulent intent against the endorsers, the only persons whom the prisoner was accused of intending to defraud, in the count upon which he was convicted. Negotiating the note, if supposed to be genuine, it is said, would be a perversion of it, and a defence would, therefore, be absolutely available against it in the hands of the holder. I do not understand the judge to have denied all weight to such a circumstance; but merely to say that the offence might, notwithstanding, be complete, or be considered as made out in evidence. The natural consequence, admitting the endorsements were genuine, was to charge the endorsers. The note was sent to Evans with the view of raising money, and had that effect. Had he found himself in danger, he would have sought to charge the endorsers. A demand and notice would follow; and they might fail in their defence, so far as it respected the mal-appropriation of the paper. Their witnesses might be out of the way, or they might have none. Even supposing the instructions to be a defence, Evans might conceal them, and Rathbun could not be a witness, for he would be interested to clear his endorsers, if they had acted, as the letter supposes, for his accommodation. In this case he was the person primarily interested. He uttered the endorsements as true; and the law imputes an intent that they should have the ordinary effect of genuine paper. *Rex* v. *Mazagora,* Russ. & Ry. Cr. Cas. 291. If they *might* work a

The People v. Rathbun.

fraud upon the endorsers, that satisfies the statute. Suppose Evans had negotiated them to a *bona fide* holder, then, at all events, the defence would have been gone.

It is only of an instrument nugatory on its face, that the law forbids forgery, or a fraudulent uttering to be predicated. *Rex* v. *Burke*, Russ. & Ry. 496. A devise of land with only two witnesses, is the case usually put. An instrument valid on its face, is equally the subject of felonious forgery, or a felonious uttering, though collateral or extrinsic facts of whatever character may exist, that would render it absolutely void if genuine. *Heath's cases*, 2 City Hall Rec. 54. 2 Russ. on Cr. 317 to 328, Am. ed. of 1836. *Rex* v. *Mackintosh*, 2 Leach, 883, 4th ed. *Rex* v. *Froud*, 1 Brod. & Bing. 300. *United States* v. *Mitchell*, 1 Baldwin's Rep. 366, 368. *Butler* v. *The Commonwealth*, 12 Serg. & Rawle, 237. This question was much considered in the late case of *The People* v. *Stearns, ante*, 409, wherein most of the material cases are cited. *The People* v. *Davis*, M. S. May term, 1837, in this court, was relied upon by the counsel for the prisoner. That was the case of a three dollar counterfeit bill, purporting to be issued by a foreign bank, passed in order to defraud the taker. The passing of such a bill, though genuine, was declared by statute to be penal. Several cases have held, therefore, that if the bill be counterfeit, the act of uttering cannot be legally adjudged a defrauding of the receiver. He is bound to know the statute, and that the bill is unavailable in his hands whether genuine or not. It was supposed, on the argument, that an indictment for such an uttering with intent to defraud the foreign bank, would not lie. I don't know that this has been distinctly held. Perhaps it would lie; for the manner of its being passed would be collateral, and not known to the bank. It might be put to expense in defending itself against an action on the bill ; and it might not, after all, succeed in the defence. The case of *The People* v. *Wilson*, 6 Johns. R. 320, is, however, the leading authority that a felonious uttering is not predicable of a counterfeit foreign bank bill, the circulation of which, though genuine, is made illegal by statute. There were two counts in that case, one for uttering a bank

bill with an intent to defraud the person to whom the bill was passed ; the other to defraud some person or persons, body corporate, &c. to the grand jury unknown. The court held the indictment bad; and declared generally that the act of illegally passing such a bill was not indictable as a felony. If it could be supposed, as it well might in some cases, that such a bill were uttered to defraud the bank, which is of course a stranger to the transaction, then the common and well established principle, that extrinsic matter of defence is not a conclusive answer to the imputation of fraud, would apply. The common object and common effect of passing a counterfeit bill is merely to defraud the taker. To that the attention of the court was, of course, mainly directed in the cases cited. It is not for him to complain that he has been defrauded in a matter of dealing which the law forbids him to participate in under a penalty, and where, as a consequence, he must know that he could not be defrauded in a legal sense. Strictly, the bill, if genuine, would not be collectable in his name, the contract of purchase being void. It is like a man complaining that a forged note had been uttered and passed to him as true, in order to induce him to commit a misdemeanor. To constitute a felonious uttering, the note must not only be put away as true, but it must be innocently taken. See *Butler* v. *The Commonwealth*, 12 Serg. & Rawle, 237. The principle here is not that the paper is void on its face, under all circumstances, like that in *Rex* v. *Moffat*, 1 Leach, 431, 4th ed.; 2 East's P. C. 954, *S. C.*; *Rex* v. *Burke*, Russ. & Ry. Cr. Cas. 291, or *The People* v. *Shall*, 9 Cowen, 778; but that there is no uttering with the particular intent *to defraud the taker*, which is the crime charged. There may well be no such intent in regard to *him ;* and yet an intent to defraud *the bank*. It is enough if the utterer have that intent even though the immediate disponee know the bill to be counterfeit, if the latter be innocent in the act of receiving; as if he procure the bill to be passed to him, knowing it to be counterfeit, in order to prosecute the utterer, and convict him. *Rex* v. *Holden*, 2 Leach, 1019, 4th ed. The quality of *intent in the utterer*, is all that the statute requires. Id.

The People v. Rathbun.

2 R. S. 562, 2d ed. § 39. The intent is not confined by statute, as necessary to be aimed at any particular person. And although the law will not allow auch intent to be predicated specifically of the act of uttering or publishing as true *to the guilty taker*, that is not necessarily incompatible with its being an offence in respect to some other person or body politic or corporate. In *Rex* v. *Mazagora*, Russ & Ry. 291, a forged Bank of England note was charged to have been disposed of with intent to defraud the bank. The jury found that the prisoner sold the note to defraud whoever might take it; but the intent to defraud the bank did not enter into her mind; yet the indictment was held to have been supported by the finding. The indictment under our statute, of uttering, need not name any person to whom the bill was uttered, though the person intended to be defrauded must be named. Roscoe's Cr. Ev. 399, 400, Am. ed. of 1836. The usual and safer way is, to state an uttering generally, naming the object of the fraud. Id.

I am, therefore, strongly inclined to think that, in *The People* v. *Wilson*, and the like cases, a count charging that the intent was to defraud the foreign bank, might have been sustained, on the mere proof of the fraudulent uttering, which was proved. We are bound to look at *purport* and simulation. What is the transaction on its face? What is the obvious intent and the probable consequence? What does the false utterer say when he passes the note? What but that "here is an instrument which will call so much silver from the vaults of the bank? And is the conduct of such a criminal to be looked upon benignly, and taken out of the general rule, which holds a man responsible for the consequences which he apparently aims to accomplish? Even if he disguise it, by giving special instructions, calculated to divert, hinder or delay the forged paper in its natural and onward course, must he, of all others, have implicit credit for his avowal of integrity? Are we bound to rely on a declaration, so glaringly inconsistent with his conduct? In no case are we necessarily bound even by the exculpatory part of a declaration given in evidence against a prisoner. It is a rule of evidence, that the declaration shall, *prima facie*, be taken

together; yet jurors are authorized to believe the inculpatory side only, if the circumstances be incompatible with that part which sets up the pretension of innocence. If a man will, with an apparent intent to kill, direct and discharge his musket at the vitals of a fellow citizen, shall he be allowed to escape, because he, at the same time, tells us that he intended no harm? In *Rex* v. *Birkett*, Russ. & Ry. Cr. Cas. 86, the prisoner had pledged a forged bill to his landlady, knowing it to be forged, as security for his reckoning. The bill was payable to his own order, but was not endorsed. He told her he should pay his reckoning in a few days, and his landlady swore that she considered herself merely as keeping the bill for him, and knew she could make no use of it, till the prisoner endorsed it. The judge told the jury the fraudulent intent in the uttering was made out, without leaving it to them whether the prisoner did not all the time mean to take back the bill and defraud nobody, paying the landlady what he owed. The twelve judges held the direction right, as the bill had been delivered in order to obtain credit.

It is said that the judge erred in advising that the forgery of the endorsements was sufficiently proved. Most of the endorsements were directly disavowed under oath by the persons whose names were alleged to have been forged. The exception is founded partly on the fact that some of the witnesses, the supposed endorsers, were not correct in several particulars, collateral to the main fact which they swore to. This did not necessarily impeach either their credibility or accuracy as to the fact that they had never endorsed. The same thing may be said as to the objection that some of the endorsers had contradicted themselves, or acted inconsistently, or had been active in promoting the prosecution; or had betrayed a vindictive temper towards the prisoner while upon the stand. They might be, and in truth were, so strongly confirmed, as to warrant the judge in pronouncing them perfectly credible. The accounts given by other witnesses called to negative the handwriting of endorsers, (for the denial, as to a few, rested upon the opinion of witnesses, direct evidence from the endorsers not being

attainable,) it is also supposed were not satisfactory in all particulars. This is very common in opinions as to handwriting ; but it is too much to say that it necessarily detracts from credibility. Looking at the whole evidence in the bill, the testimony is quite strong that the endorsements were forged, and, at least, as to a large majority of them, it seems difficult to raise a doubt. Eight of the endorsements were directly denied by the men whose names were alleged to be forged ; and the three others were shown to be simulated, by witnesses well acquainted with the true handwriting of the persons whose names were endorsed. The forging, or knowingly uttering of a single forged name, would have completed the offence. Every endorser, therefore, who was sworn, may be considered as having furnished cumulative evidence that the paper was false. These were each fortified by the opinions that other names were forged ; and altogether were still farther sustained by numerous and imposing circumstances disclosed in the course of the testimony for the prosecution. The point, raised at the close of the trial, and hastily conceded by the judge, that, to warrant a conviction, all the endorsements must appear to have been forged, was putting the matter in a singularly favorable light for the prisoner. It was saying, that if one out of the eleven alleged forgeries be found genuine, there must be an acquittal ; whereas, it is enough that the substance of the issue be proved. The offence of uttering a note on which only a part of the endorsements were proved to be forged, was within the indictment, though that averred all the names were forged. It was like charging the simultaneous uttering of eleven forged instruments of a certain description ; for each endorsement on a note is equivalent to a separate bill of exchange. In *Rex* v. *Thomas*, 2 Leach, 877, 4th ed. 2 East's P. C.* 934, *S. C.* the prisoner was indicted for uttering, at the same time, and as one offence, a great number of acquittances or receipts particularly described in a single count ; and the count was held good. Can it be possible that where you allege the uttering of eleven forged instruments, the prisoner must be acquitted because one turns out to be genuine ? So of a note

with eleven forged endorsements. If ten, or only one be forged, it makes the substance of the offence charged. No-body would think of objecting that a charge of stealing a dozen watches, could not be supported by proof of stealing a less number. The accused may always be convicted of part and acquitted of the residue in the same count, when the matter is divisible. 1 Chitty's Cr. Law, 637. And the averment that all the endorsements were forged, was not so much matter of description, that proof of a less number would have amounted to a variance.

It is perfectly well settled that the judge may, as well in a criminal as a civil action, express his opinion to the jury on the weight of the evidence. *The People* v. *Haynes*, 11 Wendell, 557, 562. Such expression is to be understood as merely in an advisory sense, unless put in form of a direc-tion as a matter of law. Here the judge expressly referred the material questions of fact to the jury as the proper judges. The charge that the crime was complete, notwith-standing the instructions and cautions in the letter to Evans, was, I have supposed, no more than a negative to the pro-position of counsel, that this part of his declaration or con-duct was conclusive against the imputed intent to defraud the endorsers. But if it went farther, it was afterwards expressly put by the judge, as was also every part of his charge in respect to conclusions from fact, on the ground of a merely advisory declaration to the jury. In conclusion, he told them that it was for the jury to judge, on the whole, as to the law and the facts upon every point in the cause. This was even more favorable for the prisoner than some books require. In the *United States* v. *Battiste*, 2 Sumn. 240, a capital case, and in *Townsend* v. *The State*, 2 Blackf. 151, the case of a misdemeanor, it was held that the instruc-tions of the court upon matter of law are conclusive with the jury, in a criminal cause, the same as in a civil. The question too was much considered in the latter case, and learn-edly and elaborately discussed by Mr. Justice Holman, who delivered the prevailing opinion of the court. His reason-ing comes with additional force under a system of criminal aw, which allows a review by a bill of exceptions of the

legal questions decided. Be this as it may, there are few cases in which a judge can be warranted in telling a jury, as he was requested to do here, that a detached piece of evidence should conclude, see *Savage* v. *Birckhead*, 20 Pick. 167, 173; and especially where the proposition involves a question of intent to defraud.

The *venue* was, I think, properly laid in the county of *Genessee*. The statute is, that every person convicted of having *uttered and published* as true, with intent, &c. 2 R. S. 562. What is an uttering and publishing? TOMLINS says, "any *disposal* or *negotiation* of a forged instrument *to another person*." Toml. Law Dict. Forgery, 2. And it has very nearly a like meaning in general parlance. JOHNSON, in his dictionary, 4to, defines *utter*, "to sell, to vend," and gives an instance of its use in this sense by several writers from Shakspeare downward. It may also mean, "to emit at large or publish." Id. In the statute, however, it is used in a sense not quite so broad, if we are to judge by the English cases; and the word *disposal*, used by Tomlins, is perhaps, according to those cases too comprehensive. *To dispose* may mean "to transfer to any person," or "to put into the hands of another," or "to put away by any means." Johns. Dict. 4to. To dispose, 8, 9, 14. Accordingly, the English parliament passed two statutes, one against *uttering and publishing* and another against *disposing of or putting away*. In *Rex* v. *Palmer*, 2 Leach, 978, 4th ed., 4 Bos. & Pull. 96, (often cited 1 N. R.) *S. C.*, Russ. & Ry. Cr. Cas. 72, *S. C.*, it was held, that the prisoner delivering a forged note to his accomplice, for the purpose of being passed, the accomplice having actually tendered it for goods which she purchased, though it was refused by the vendor, was a disposing of or putting away by the prisoner. Rooke, J. said that the prisoner could not recover it back from the accomplice by an action; that the objection of the possession still constructively continuing in the prisoner was a fiction, which should not be applied to defeat a criminal statute; and that any delivery to another with a fraudulent purpose was an offence within the words "dispose of or put away." *Rex* v. *Giles*, 1 Mood. Cr. Cas. 166, S. P. The offence of *uttering*

had been provided for by a previous statute; and in *Rex v. Palmer* there was a count for that, as well as for disposing, &c.; but the judges hesitated, and forbore to determine whether the prisoner was guilty within the former statute. The word *uttering* would seem to be more accurately defined by *negotiation*, which means, in popular use, an intercourse of business, trafficking or treating. Johns. Dict. 4to. *To negotiate*. Accordingly, not only a sale or paying away a counterfeit note or endorsement, but obtaining credit on it in any form, as by leaving it in pledge, *Rex v. Birkett*, Russ. & Ry. Cr. Cas. 86, or indeed offering it in dealing, though it be refused, *Rex v. Arscott*, 6 Carr. & Payne, 408, *Rex v. Shukard*, Russ. & Ry. Cr. Cas. 200, *Rex v. Palmer*, before cited, amount to an uttering and publishing. In the latter case, the general opinion of the judges, was, that if the prisoner had delivered the forged note to an innocent person for the purpose of having it passed away, this, *per se*, would have been a guilty uttering by the prisoner. At least, the doctrine is so stated by the report of the case in 2 Leach, 981, though I understand the report in 4 Bos. & Pull. 97, not to consider the uttering as complete until the innocent agent should have tendered the note in payment. Indeed this would seem to be the true sense of both reports; for the judges are represented as basing themselves on the doctrine in Foster's Crown Law, 349, that "where an innocent person is employed for a criminal purpose, the employer must be answerable." Now all the cases put by Foster are these of an offence completed by the innocent agent. One is of poison knowingly prepared and delivered by A. to D. with instructions to administer it to B. The agent D. delivering it according to instructions, being ignorant of its quality, and B. dying of the poison, A. is guilty as a principal, though absent from the place of delivery. And he says the law is the same in the case of inciting a madman, or a child not at years of discretion, to commit a felony in the absence of the instigator. So Hale says, "A. lets out a wild beast, or employs a madman to kill others, whereby any is killed. A. is principal in this case, though absent, because the instrument cannot be a principal. 1 Hale, P. C. 615, Lond.

ed. of 1800. The principle of these cases is that the really guilty man shall be deemed present, and in construction of law the actual perpetrator of the mischief at the place where the crime happens to be consummated. This too is the notion which was applied to a fraudulent uttering in *Rex* v. *Collicott,* if the reporters, nearest cotemporary with that case are to be relied on. It is reported in several books, 2 Leach, 1048, 4th ed.; 4 Taunt. 300; Russ. & Ry. Cr. Cas. 212; the latter materially disagreeing with the former as to the decision. In that case the indictment was, in several counts, for uttering, vending and selling forged medicine stamps. The venue was laid in *London,* according to Leach and Taunton. The forgeries were concocted by the prisoner in *Middlesex,* and there pasted on the outside of the medicine bottles. These were all done up in a package which was superscribed with a direction to " Messrs. Wood & Cunningham at Bath," from whom the prisoner had previously received an order so to direct the package; but they were innocent of the forgery and uttering. The prisoner delivered the package thus directed, to a lad, as his porter, at his shop in Middlesex, to carry to the C. & F. inn, at Aldersgate-street, London, in order that it might be conveyed by R.'s waggon, thence to the consignees at Bath. The prisoner helped to put the package on the lad's shoulders, and wrote a letter to the consignees, advising them of his having sent the medicines according to their order; and in the package enclosed an invoice or bill of parcels. The package was delivered by the lad at the London inn, and thence was carried by the waggon, in due course to Bath, where the innocent consignees opened it and exposed the medicines for sale with the forged stamps pasted upon them. The order of the consignees was general, that the medicines should be sent to them, and on the package arriving they paid the carrier for bringing it. A majority of the judges held the offence was complete in *London,* and the venue properly laid there, according to Leach and Taunton; but the difference among them being serious, the question was not finally decided. I have collected the facts from Leach, and Russell & Ryan, the latter stating them the most fully; though there

is a singular discrepancy between the two earlier reporters, Leach and Taunton, on one side, and Russell & Ryan on the other. They all concur that the prisoner was tried at the Old Bailey, which was in *London*—the two former saying the *venue* was laid there, and that a majority of the judges held the offence complete there. Russell & Ryan, however, state the *venue* as having been laid in *Middlesex*, and that a majority of the judges were of opinion that there was an uttering and vending in *Middlesex*, while a minority thought not. The latter reporters state the division as standing six to five, and give the names thus : " At a meeting of all the judges, the majority, viz. Lord Ellenborough, Mansfield, Ch. J., Grose, J., Thompson, B., Le Blanc, J. and Bayley, J. thought it an uttering and vending in Middlesex ; Heath, J., Lawrence, J., Chambre, J., Graham, B. and Wood, B. thought not." On the argument, they make the prisoner's counsel contend that no uttering was proved in the county of *Middlesex*, the prisoner not having parted with the possession there ; but the package remained in the care and custody of his servant all the time while there, and it was under the prisoner's control all the time while it remained in Middlesex, so that he might countermand the sending and delivering of it. The like objection was applied to the counts for vending and selling. The same account is given of the case by a judge who took part in the decision, Bayley, J. *arguendo*, in *Rex* v. *Burdett*, 4 Barn. & Ald. 154, except that he makes the division seven to five. This was in 1820, and Russell & Ryan's Reports were published in 1825 ; Taunton's Report was in 1812, the very year of the decision, and Leach's in 1815. Which was correct, it is impossible for us to say. The trial being, as stated by Russell & Ryan, at the Old Bailey in London, is not decisive of the venue ; for it was customary to hold the jail delivery there, as well for the county of Middlesex as London. 1 Chit. Cr. Law, Am. ed. 1836, p. 189. 2 Toml. Dic. London, p. 483, Philad. ed. 1836. Doug. 796, 7. It is stated, both by Taunton and Leach, that the case went off by the prisoner being afterwards tried for a like uttering, which was clearly in *London*. The second case is reported in

Russ. & Ry. 229. The trial is stated to have been at the Old · Bailey, but the venue is not mentioned. The difference between the judges being so serious, the decision was never acted upon. The English elementary writers have some adopted the first report as given by Taunton and Leach, Roscoe's Cr. Ev. 398, Amer. ed. 1836, and others that as given in Russell & Ryan, 1 Chitty's Cr. Law, 190, Amer. ed. 1836. But the question of locality was, on the whole, found so difficult to be settled, either by law or evidence, that a statute was afterwards passed in England, making forgery, uttering, &c., triable wherever the accused should be arrested or in custody, and allowing the venue to be laid there. Stat. 1 W. 4 ch. 66, § 24, cited in Roscoe's Cr. Ev. 409. *Collicott's case* is no longer, therefore of any consequence in England with regard to the venue in cases of uttering; and I have gone into its history with a view of seeing what weight 'it may carry as an authority with us, where the question is still open and must be met. It will have been seen that the judges were almost equally divided, and the reporters do not agree on which side the majority was. Taking Taunton and Leach's report, the uttering was held to be complete when delivered at the inn or to the carrier in *London*, and the venue to be properly laid there. According to the other report, the delivery of a sealed package to the prisoner's servant in *Middlesex*, who was ignorant of its contents, and from whom it might have been immediately taken back, was held to be an uttering there, and fixed the venue. In the latter view, at least, it seems far from being a reliable case, and Bayley, J., who was with the majority, shows by what he afterwards said in *Rex* v. *Burdett*, 4 Barn. & Ald. 154, 5, that he had on reflection become, at least, quite diffident of his former opinion. With what propriety could the man be said to have negotiated the stamps while they remained in his own hands, or, which is the same thing, in the hands of his agent, the porter? The case seems to accord better with principle, if we consider the uttering complete when the package was left at the inn, which, under the circumstances, was a constructive delivery to the consignees at that place. The consignees had given directions to have

the goods sent by a carrier, with the direction as endorsed; and nothing is better settled, than that a reception by him is a reception by the consignee, who may in virtue of the delivery bring trover for the goods. Nor is it necessary that the specific carrier should be named by the consignee. His general direction to send by *a carrier* makes any carrier, whom the consignor may select, the servant of the consignee, and that, though he even be paid by the consignor. Jeremy's Law of Carriers, 94 *to* 99, N. Y. ed. of 1816. But the carrier is especially his servant, where, as in *Collicott's case*, he pays for the transportation. In short, the case at London came to the same thing as if the consignees had been there, and personally received the forged stamps of the prisoner. Clearly that was a complete uttering within the strictest sense of the term. It was a sale of the stamps to the consignees. To have holden, on the other hand, that a delivery to the porter at Middlesex, who was a mere innocent instrument of the prisoner, constituted a completion of the crime, would be to say that a man may be guilty of uttering, while he himself holds a package of forgeries, without having offered them to any human being, unless it can be made out that the porter at Middlesex was the servant of the consignees, as well as the carrier at London. That, I imagine, can hardly be pretended; or if that be the point decided, it takes away all the application of the case to the one before us, in which Evans, the consignee, certainly held no privity with any one employed in carrying the prisoner's letter. Evans had given no previous direction whatever to have the letter sent. The whole originated with the prisoner. The instruments employed, the post office and its agents and servants, were his. They were innocent insruments; and if we are warranted in applying the doctrine cited from Foster and Hale to an uttering, it could not have been completed till the letter bearing the forgery had reached its destination at Batavia. That the doctrine does apply to the crime of uttering, we have already seen by *Rex* v. *Palmer*. That this crime admits of principles and accessories, like most other felonies, is abundantly settled by other authorities. *Rex* v. *Soares*, Russ. & Ry. Cr. Cas. 25. 2 East's P. C. 974. *Rex* v. *Davis*, Russ.

& Ry. Cr. Cas. 113. *Rex* v. *Badcock*, id. 249. *Rex* v. *Stewart*, id. 363. *Rex* v. *Giles*, 1 Mood. Cr. Cas. 166. And we have before seen what act constitutes a simple uttering, viz. a sale, &c. or at least an offer. Tilghman, Ch. J. in *Commonwealth* v. *Searle*, 2 Binney, 339, says, declaring or asserting the goodness of a note is an uttering. But in *Rex* v. *Shukard*, Russ. & Ry. Cr. Cas. 200, it was held that merely showing forged notes, in order to induce another to believe the prisoner a man of substance, and procuring the other to keep them for him, was not enough. The judges seemed to be of opinion that to make an uttering, the forged notes should be parted with, or tendered or offered, or used in some way to get money or credit upon them. See also *United States* v. *Mitchell*, 1 Baldw. R. 366, 7.

Taking any of the definitions to which I have adverted, let us inquire where was the uttering of the note in question with its forged endorsements complete? Can the mailing in a sealed letter at New York be called a negotiating? Was it by that act alone parted with, or tendered, or offered or used in any way to get money or credit upon? Was its goodness thus even declared or asserted? It was secretly put in a course of transmission, through agents ignorant of its very existence; and this was all that was done at New York. Uttering implies two parties, a party acting and one acted upon. If it be by way of sale, there must be a vendee; if by pledge, there must be a pledgee; if by offer, there must be some one present to hear the offer; and if by simply declaring its goodness, there must be some one addressed as a reader or a hearer. A sealed letter cannot in the nature of things perform any of the offices mentioned, till it reaches the place of its address; and then it may perform all or any of them. The statute 27 Geo. 2, c. 15, made it felony to send a threatening letter. One was sent by an innocent agent in one county to the post in the same county, and delivered by the penny-post in another county where the venue was laid, to the prosecutor. The venue was held to have been well laid in the latter. *Girdwood's case*, 2 East, P. C. 1120. 1 Leach, 142, 4th ed. One would suppose that if it be possible to consummate a felony

by letter without its being received, it would have been so in a case where the mere *sending* is declared a felony. Yet even in such case the letter completing its office by the penny-post, was held a consummation of the offence by the hand of the prisoner, though he was at the time actually in jail in another county. Thus the cases in respect to a felonious uttering and the like acts where they are made felonies are nearly uniform, that unless the agent of transmission be himself guilty, his act is deemed that of the employer at the place where the uttering is completed. It is the same in principle whether he employ one or many agents; the innocent adult, the child, or the madman of Foster, the wild beast of Hale, or the agents of the post office and the mail. The guilty employer, at whatever distance, cannot shield himself under the idea of being a mere accessory, as if his agents were guilty like himself. But he is a principal, present and acting, in legal contemplation, at the place where the crime is finally perpetrated, and he may be indicted and tried there. That place, in my opinion was, as to Rathbun, Batavia in the county of Genessee. There the letter was opened by Mr. Evans, and the transfer of negotiation of the note consummated. I am also of opinion that there was no uttering at New York, or at any place beside Batavia, within the meaning of the statute. To my mind, therefore, the case is clear enough for the prosecution. I think the attorney general was bound to lay the venue in the county of Genessee. The crime of forgery is one felony. That may be complete without any uttering and even without publication. 2 Russ. on Cr. 295, Am. ed. of 1836, and the cases there cited. Uttering is another and a distinct felony. Even delivery to a guilty agent, for the purpose of uttering, thus absolutely and irrevocably parting with the paper, and though the agent complete the uttering, leaves the employer but an accessory. The principal crime is committed by the agent. Till he has performed his office there can be neither accessory nor principal. This alone shows that the disponee must be reached. The same thing, where the agent is innocent, makes the employer a principal. The distinction lies in the doctrine of principal and accessory, a doctrine peculiar to felonies;

and the distinction cannot be maintained if a mere delivery for the purpose of negotiation is in itself an uttering.

So much have I thought it necessary to say before noticing several cases of mere misdemeanor which were cited in argument and much relied on for the prisoner. They certainly do put it very strongly that the mere mailing of a letter, or giving it to an agent, with intent that it should be carried, shall in itself be deemed a publication, a sending or an attempt, and as such, indictable in the county where the act was done, though the delivery was in another. The two first were cases of libel, *Rex* v. *Williams*, 2 Camp. 507, and *Rex* v. *Burdett*, 4 Barn. & Ald. 95. In both it may be taken as holden, that the mere putting a sealed libel in the post office of one county, with intent that it should go to and perform its mischievous purpose in another, was a publication, a complete offence in the first, and indictable there. The third case was *The United States* v. *Worrall*, 2 Dall. 384, 388, wherein it was holden that the mailing of a letter in Philadelphia, in the district of Pennsylvania, addressed and offering a bribe to a U. S. officer in New Jersey, in another district, was in itself a criminal attempt to bribe, and indictable as such in the former district. It is unnecessary to impugn the authority of either of these cases, allowing them to rest entirely on the ground already stated, which is putting them most favorably for the prisoner. As to the two first cases, it is impossible to say that such a publication merely is a felonious uttering within the statute, though on the peculiar doctrines of libel it may be enough for the purpose of making out a misdemeanor. As to the last case, the writing and sending a letter, or mailing it in Pennsylvania for the purpose of being sent, was in itself literally *an attempt* there to bribe the officer, though the letter was addressed to him at his residence in New Jersey. The court said the writing and delivery were to be considered as one act, and, as far as respected the defendant, it was consummated at Pennsylvania. They thus placed it on the same footing as the libel in the two first cases; a pernicious writing published in the place where it was written. Indeed it is well settled that the bare attempt to commit a misde-

meanor, or to persuade another to commit one, is in itself a misdemeanor. To this, several cases were cited in *Rex* v. *Higgins*, 2 East, 5 ; and no doubt the writing and mailing a letter to another, persuading him to commit a misdemeanor, is, as an attempt indictable. The doctrine of mailing libels may well be rested on this ground. The act is an attempt to provoke a breach of the peace. So, according to *Rex* v. *Higgins*, Rathbun might have been indicted in New York, for an attempt to commit the offence of a felonious uttering ; for it is equally well settled that an attempt to commit a felony is in itself a misdemeanor. That was the very point of *Rex* v. *Higgins*. The indictment was for persuading another to steal ; he refused to comply, yet the indictment was maintained. So, in the case at bar, had the letter miscarried and the felonious purpose of uttering been defeated. It being completed, however, the act which was before but a misdemeanor, makes the writer a mere accessory to, or a principal in the higher crime, accordingly as the agent was guilty or innocent.

But there is another reason why we cannot argue from the doctrine of venue in cases of misdemeanor, to that of venue in cases of felony. In the former, where the offence is made up of two material acts or events, done or happening in different counties, the venue may be laid in either. This was abundantly shown in *Rex* v. *Burdett*, 4 Barn. & Ald. 95, and agreed by the judges, except Bayley, J. and he was by no means clear against it. See 4 Barn. & Ald. 155. The rule was held to be the same as that advanced by *Bulwer's case*, 7 Rep. 57, in respect to a civil action. There the declaration was in trespass on the case, for maliciously outlawing the plaintiff, on a *ca. sa.* in which proceeding he was, as a consequence, imprisoned in Norfolk, where the venue was laid. But the *ca. sa.* was purchased in Middlesex, and delivered to the sheriff in London, who made the return of *non est*. Then the exigent was executed with proclamations in London, and the writ of *capias utlagatum* directed to and executed by the sheriff of Norfolk, by arresting and imprisoning the plaintiff. All these acts were held legally ascribable to the defendant, as done by

him in the several counties. The action was held to be
well laid in Norfolk. So, said the court, it would have been
equally well if laid in London or Middlesex; for they adopt-
ed this rule: "*In all cases* where the action is founded upon
two things done in several counties, and both are material or
traversable, and the one without the other doth not maintain
the action, there the plaintiff may choose to bring his action
in which of the counties he will." The rule is followed out
by that unparalleled copiousness and variety of illustration
peculiar to Lord Coke, in which its application is shown to
appeals of murder and other felonies. In *Rex* v. *Burdett*,
the indictment was for writing and publishing a libel in *Lei-
cestershire*, where the venue was laid. There was evidence
that it was written and enclosed in a letter there, and deliver-
ed to an agent with directions to deliver it to B. in *Middle-
sex*, who accordingly received it. One objection was, that
the venue should have been laid in *Middlesex*, because the
offence was not complete till the publication. A majority of
the judges agreed that, admitting this to be so, the venue
might be laid in either the county where the libel was writ-
ten or sent, or that, where it was published. But it was ad-
mitted both by the attorney general and the judges, that, had
the crime been a felony, the government must have sought
out the place where it was consummated, and laid the venue
there, or else it would not be indictable in either county. Ab-
bott, Ch. J. says, the sending or carrying is the commence-
ment of the publication; the receipt and reading are its con-
summation. 4 Barn. & Ald. 176. In *Bulwer's case*, the *vi-
sible wrong*, the imprisonment, was spoken of as the consum-
mation; and that being in *Norfolk*, the venue was said to be
laid there with peculiar propriety. Again, it is said, where a
mortal stroke is given in one county, and the man dies in
another, the death which accrued on the stroke made the felo-
ny, and the appeal was held to lie in the latter county. Again,
the forging of a deed in one county and publication in another,
gives an action in the latter. Other books give farther instan-
ces. An usurious agreement is made, or a draft given for
usury money in one county, but the money is received in

another; the receipt of the money consummates the offence, *Fisher* v. *Beasly*, 1 Dougl. 235. *Scott, q. t.* v. *Brest*, 2 T. R. 238. *Scurry, q. t.* v. *Freeman*, 2 Bos. & Pull. 381. Money is obtained in one county, on a false pretence made in another; the venue should be laid in the former, for the offence was consummated by receiving the money. 2 Stark. Ev. 897, Am. ed. of 1837, note (*l.*) *Rex* v. *Buttery*, cited 4 Barn. & Ald. 179. A conspiracy in one place, to obtain money from the government by false vouchers, is indictable in another where the vouchers are delivered; for the delivery consummates the offence; and a delivery by transmission in a letter through the post is within the rule. *Rex* v. *Brisac*, 4 East, 164. And see *The People* v. *Mather*, 4 Wendell, 229, 259, per Marcy, J. A man in Ireland sent a libel to be published in the county of Middlesex, England, which was done, and he was held indictable in the latter county. *Rex* v. *Johnson*, 7 East, 65. And see *Rex* v. *Watson*, 1 Campb. 215, 216.

In all these cases, had the offence been felony, and pursued criminally as such, and the action of the accused as a principal offender, could have been, as it may be in case of a misdemeanor, continued by legal construction to the place of consummation, the venue might and must have been laid there. The doctrine of election has never, as in case of civil actions, and indictments for misdemeanor, been extended as a rule to felonies. There may be exceptions; as where goods are stolen in one county and transported into another; but the reason of this is, that there is a complete felony in each county. The same exception was once thought applicable to embezzlement by servants. *Hobson's case*, 1 East's P. C. *addenda*, 24. Though in a subsequent case, the court thought it safer to look exclusively to the place of consummation. *Rex* v. *Taylor*, 3 Bos. & Pull. 596. 2 Leach, 974, 4th ed. Russ. & Ry. Cr. Cas. 63. The doubt, when a felony was committed by separate acts in two different counties, has been, whether it could be treated as a complete felony in either. But I shall notice presently that the doubt has no application to the case at bar.

The People v Rathbun.

In *Rex* v. *Burdett*, and *The United States* v. *Worrall*, there was direct evidence that the letters had been received according to the direction. In *Rex* v. *Williams*, the mailing was evidence of sending, and for this act alone the indictment was drawn. See per Bayley, J. in *Rex* v. *Burdett*, 4 Barn. & Ald. 154. In the two former, there was a plain right to elect the venue; in the latter, it seems to have been laid in the very county of the offence. Had the letter arrived that would have made a case of election; and perhaps the arrival may be deemed to have been shown, according to the doctrine of presumptive evidence. It would have arrived in the ordinary course of the post office, a public department; and that was a ground for the presumption, till the contrary was shown. Phill. Ev. 8th ed. 471. Per Park, B. in *Warren* v. *Warren*, 1 Cr., Mee. & Rosc. 252. In no view, therefore, do I think, that the decisions cited concerning misdemeanors can be applied to the case at bar. In defining and in trying felonies, the law is more careful to resolve the offence into the separate acts which produced it, with a view to distinguish between principal and accessory. . Whereas, in misdemeanors, all concerned are principals, and every act tending towards its commission seems of itself to be an offence of the same grade with the final act or event; indeed, to be identified with it. Thus, in *Rex* v. *Burdett*, 4 Barn. & Ald. 126, Best, J. speaking of the libel, said : " The moment a man delivers a libel from his hands, his control over it is gone. He has shot his arrow, and it does not depend upon him whether it hits the mark or not. There is an end of the *locus penitentiæ*, his offence is complete, all that depends upon him is consummated, and from that moment, upon every principle of common sense, he is liable to be called upon to answer for his act." It is evident that, to import such a doctrine into the law of felony, would at once subvert the law of principal and accessory, and, what is more pertinent to the case before us, it would be to overrule several decisions which I have cited denying the application of that doctrine as to felonies committed either by force or fraud. A man writes a letter directing another to commit a robbery

or a forgery, or utter a forgery, either of which is done in his absence, no one will pretend that the writer is more than an accessory before the fact: whereas, had the object been an assault, he would have been a principal, on his advice being followed. He sends poison into another county, by an innocent agent, to be administered there as a medicine; his arrow is sped, and he is at once guilty of a misdemeanor in his own county; but not of a felony there, though the poison do its office. The law pronounces him present at the place of ministration, by one of those fictions, without which there would be a failure of justice; for if he be not holden to a trial, no one can be. In that way, one who is out of the state might send into it and administer fatal poison with impunity to every one concerned; for the innocent agent could not be punished. So of uttering forged paper through the post office. The venue must be laid at the place where the letter is delivered; and the offender cannot be allowed to gainsay the fact that he was present, and himself committed the crime where it is received. The same rule obtains between county and county. That it is fallacious to reason, concerning venue from cases of misdemeanor to those of felony, or *vice versa*, I also refer to what was said by Abbott, Ch. J. in *Rex* v. *Burdett*, 4 Barn. & Ald. 171 to 175, and the remarks of some other judges in the course of the cause.

One word may be due to *Doctor Hensey's case*. There intercepted letters were held to be overt facts of high treason. 1 Burr. 646, and *Gregg's case* there cited. It would probably have been the same thing had the letters never been mailed; but confined to the prisoner's custody. *Scribere est agere* is a true saying, though it was misapplied in *Sidney's case*. Foster, 198, Dublin ed. of 1791. Such evidence is admitted on the *peculiar doctrines of high treason,* wherein there are no accessories any more than in misdemeanors. The very intent to commit treason is many times actual treason. Marcy. J. in *People* v. *Mather,* 4 Wend. 259, 260. 1 Chit. Cr. Law, 261, Am. ed. of 1836. A letter indicating the intent, and connected with the prosecution of a treasonable purpose, is clearly evidence, therefore,

of the crime itself; and, if mailed, it is plainly an overt act. Foster, before cited. It does not follow that a like overt act, tending to the commission of a felony, is in itself the felony. I have already cited several decisions to the contrary, in the very case of uttering forged paper.

The rule of the common law, that where a felony is begun in one county and consummated in another, it cannot be indicted in either, but the people must be thrown back upon an indictment as for a mere misdemeanor in each county, 1 Chit. Cr. Law, 177, Am. ed. of 1836, was not much insisted on at the bar. It seems never to have been applicable to the case of a man in one county committing a felony in another through the medium of an innocent agent. Chitty lays down the rule, on the authority of *Girdwood's case*, before cited, thus : " Where a person, by means of an innocent agent, procures a felony to be done in another county, he may be indicted there, though not personally present. Thus, in case of a threatening letter, sent by the hands of a person innocent of its contents, the defendant may be indicted in the place where the letter was received." 1 Chit. Cr. Law, 190. The rule is I think well sustained both by authority and principle. It is, moreover, directly applicable to the case at bar.

Did the court below err in refusing to appoint triors of the impartiality of *Grey*, the juror ? He was regularly challenged by the prisoner's counsel as not being impartial, and triors demanded. These were denied, on the ground that they had been waived by the examination before the court without asking for triors, and that this had made the court triors. The correctness of the decision depends entirely on the construction which is to be put upon the proposition of the court in the outset ; which was, that either party had a right to triors *on the question of indifferency ;* but, *if this were not insisted on,* it would be more convenient and perhaps desirable that each should be sworn to answer *whether he had formed and expressed an opinion.* No objection was made ; this course was pursued with all the jurors, *Grey* inclusive, and afterwards, as to him, triors were notwithstanding demanded. That the counsel, and the

prisoner through them, assented to the proposition made by the court, there can be no doubt; and it was carried into full effect in the case of Grey himself. · The court had said, .. " If you do not insist on triors of *indifferency*, it will be more convenient and desirable that the juror be sworn as to his having formed and expressed an opinion." On his being called, he was so sworn and interrogated and answered upon the point of *indifferency*. I understand the court as having proposed this oath and examination before them, by way of substitute for the regular trial of a challenge to the *favor*, which is synonymous with *indifferency*, the word used. It is said a contrary exposition is derivable from the form of the oath proposed. True, the only ground covered by the oath was the having formed and expressed an opinion, which is clearly a principal cause. *The People* v. *Vermilyea,* 7 Cowen, 108, 121. *The same* v. *Mather,* 4 Wendell, 229, 241. The better opinion, I think, as collectable from these cases is, that the merely forming without expressing an opinion is a principal cause. The oath, therefore, was not broad enough to elicit the grounds of a challenge to the favor. A juror may be quite partial, and liable to challenge without principal cause. But incidentally mentioning the form of the oath was not intended to qualify the proposition as to the *tribunal* before whom the trial should be had. This *tribunal* was changed by consent. The court was evidently intended as the triors of all challenges; and if the prisoner desired a change in the form of the oath, his counsel should have specifically requested it, and if refused, put his exception on that ground.

The law allows triors for the benefit of the prisoner, or the people. Either may waive it. *Quilibet protest renunciare pro se introducto,* is a maxim of universal application. The prisoner may even waive his right to a trial at the hands of a jury on the merits, by pleading guilty. Having this power, no one will pretend that he cannot consent to any thing else. He may waive any matter of form or substance, excepting only what may relate to the jurisdiction of the court. His power to agree that the court shall act as triors of a challenge, which may be implied from the

course that he and his counsel take in respect to the mode of trial, was held in *The People* v. *Mather*, 4 Wendell, 229, 245. A man cannot legally be indicted and tried as accessory to a felony till the principal be convicted. Such a trial is contrary to an ancient and fundamental rule of law. Yet, says Lord Coke, if he go to trial without insisting on the objection, he shall be holden to have waived it. To this he expressly applies the just maxim cited, *Quilibet, &c.* 2 Inst. 183.

It was intimated in argument, though not much insisted on, that even if counsel had consented to one mode of trial, they might still revoke such consent, and stand upon their former legal rights. To that proposition I cannot assent, even in respect to a trial for felony. The principle is the same as that which binds in civil cases. Any agreement deliberately made, any plain assent, express or implied, in respect to the orderly conduct of a suit, or even an agreement to admit a material fact upon the trial, cannot be revoked at the pleasure of the party. In the business courts, such agreements are so common, and therefore so apt to be forgotten or misunderstood, that they are generally required by rule to be put in writing. The court for the correction of errors, however, where there is no such rule, hold an oral agreement binding. *Chamberlain* v. *Fitch*, 2 Cowen, 243, 245. Agreements in the courts of oyer and terminer stand, I presume, generally upon the same footing. A prisoner on trial there who defends by counsel, and silently acquiesces in what they agree to, is bound the same as any other principal by the act of his agent.

The courts specifically enforce agreements made in respect to the course of the cause, by persons properly authorized. They do not allow the party to violate a stipulation and put his antagonist to an action. What ought to be done, they will consider either as having been done, or summarily enforce its execution by process of contempt. Where an attorney agreed at the trial to release the interest of a witness, who was therefore sworn, on motion for a new trial the court said they would hold him to have been actually discharged, inasmuch as he might compel the attorney to

execute his agreement. *Heming* v. *English*, 6 Carr. & Payne, 542. 1 Cr., Mee. & Rosc. 568, and 5 Tyrwh. 185. In *Davis* v. *Burton*, 4 Carr. & Payne, 166, the defendant's attorney, by consent of the defendant, having orally agreed, at a private interview with the plaintiff's attorney, to admit certain facts on the trial, the court, upon the cause coming on and on oral proof of the agreement, held the defendant specifically to perform it, by taking the facts as actually admitted at the trial.

I will not deny that agreements may be thus enforced in a criminal case. Suppose a prisoner to declare on full advice that he will plead guilty, on which the prosecutor's witnesses are all dismissed ; might not the court order the plea entered as if the same consequence had been produced in a civil cause on an attorney stipulating to give a cognovit? All this sounds harsh, and no court would enforce a stipulation to plead guilty, unless in a case where they plainly saw that the object of the prisoner was to defraud the course of justice. Agreements to waive his personal rights ought not to be enforced except in such cases, though the right of the court may be exercised to the same extent as in civil causes. *The People* v. *Mather*, 4 Wend. 229, 245, 246, was referred to as a case in which the accused had been allowed to revoke his agreement. He had stipulated that every juror called should be considered as challenged by each side. The juror examined appeared to be biased against the accused, who was allowed to revoke his side of the agreement, that is, waive his challenge. The court put his right on the general ground to which I have before adverted, that a party may always waive an advantage to himself. The rule has no application where he is seeking to frustrate an agreement made for the benefit of the prosecution. But in the case at bar, the agreement of the prisoner when he sought to revoke it by demanding the ordinary triors, had been executed. The juror had been put upon his trial before the court, and it did not lie with the prisoner to revoke it at that stage, any more than if the trial had terminated, and the juror had been sworn and taken his place in the box. Nothing indeed appears, in the instance before us, which would

The People v. Rathbun.

have seriously affected the interests of justice, had the court given way, but the principle put was convenience. The delay arising from a formal trial for each juror was doubtless alluded to, which is, to be sure, a mere inconvenience. But it is sometimes an harrassing and vexatious, not to say a dangerous inconvenience even for the prisoner. A jury fatigued by delay cannot well appreciate his defence. The attorney general had waived the same right on his part, upon the same reason, and the formation of the jury had progressed upon both sides. Had the court given way to one side, justice would have demanded the same thing for the other; and thus perhaps the jury, so far as it was formed, might have been withdrawn, and a new jury throughout placed in the box. The prisoner had but to intimate his desire to have triors, in reply to the suggestion of the court, when his right would, no doubt, have at once been recognized. I do not deny its importance; and the court will allow and even advise him to recall any improvident concession which is apparently prejudicial to his rights. They will do so on the mere suggestion of counsel that the concession was prejudicial; but not where injury is evidently out of question on the side of the prisoner, while the prosecution may sustain a serious inconvenience. On the whole, I am entirely satisfied that the challenge was legally disposed of.

It struck me as doubtful, on the argument, and I so mentioned at the time, whether a bill of exceptions would lie for refusing triors; and therefore as questionable, whether the challenge and the proceedings upon it were properly before us. The doubt may have been unfounded. The statute allowing a bill of exceptions in criminal cases makes it applicable to the same extent as it was in a civil cause. 2 R. S. 616, 2d ed. § 21. There a bill of exceptions was confined to some point of law arising at the trial, which could not be made apparent in a course of regular entry on the record. It was, therefore, denied to be applicable in *Ex parte Vermilyea*, 6 Cowen, 557, to a challenge for principal cause, which had been raised, debated and overruled as insufficient. The reason given was, that such challenge should be entered on the record as if it had been demurred to, and in the form

of a demurrer, with a judgment rendered. A challenge for principal cause is also entered of record where it is tried and a verdict· rendered by triors, as may be seen in 1 Trials per Pais, 211, 212, ed. of 1766. Yet I find it said in several books, that an exception may be taken where a point of law arises in respect to a challenge. It was so said expressly in *Rex* v. *The City of Worcester,* Skin. 101, if the judge overrule the challenge upon debate without demurrer. The reason given is, because the matter does not appear by entry upon the record. It is also said in Bull. N. P. 316, ed. of 1788, that a bill of exceptions lies upon some point of law either in admitting or denying a challenge. Buller cites what was said in *Bridgeman* v. *Holt and others,* Show. Parl. Cas. 120, which was but an argument of counsel before the lords. However, he is himself an authority; and perhaps it accords best with the practice to allow a bill of exceptions on any point of law decided by the court respecting a challenge, which does not appear on the record. For this purpose, the decision in respect to the challenge may be deemed parcel of· the proceedings of the trial. The statute of Westm. Edw. 1, ch. 31, is that when a man impleaded before any of the justices doth allege an exception, it shall be allowed. In terms it extends to matter of exception respecting a challenge as well as any other. On the whole, it certainly cannot be denied on authority, and perhaps not on principle, that the question respecting the challenge comes up in proper form. It certainly was a very proper subject for examination in some way, which can hardly be said of all the matters in the bill.

The bill seeks, with quite too much industry, to draw the whole of the questions, both of fact and of law, from the court below and present them here. A great deal of circumstantial evidence was adduced on both sides, and the admission of all that was introduced on the side of the prosecution, as far as it could be reduced to subdivisions, was excepted to either for incompetency or insufficiency. Again; the intimations or directions of the judge, that other parts were or were not material, and especially that they tended to support or repel certain conclusions, were excepted to,

whenever such intimations or directions were adverse to the prisoner. Again ; the judge was requested by the prisoner's counsel to charge whether certain conclusions arose from certain sets of facts or the testimony of certain witnesses, in favor of the prisoner; and on his declining so to do, or charging unsatisfactorily to the prisoner's counsel, excep- tions were interposed. Some exceptions were irrelevant in supposing matters to have been in the charge, which do not appear there. The exception returned as taken *after* the trial and verdict, because the court below refused to stay the proceedings, most clearly should not have been inserted in the bill ; and we hope we shall not have occasion to repeat that exceptions cannot be taken in respect to any of the pro- ceedings *before* or *after* the trial. See *The People* v. *Dalton,* 16 Wendell, 581, 583, 4.

Many of the exceptions were so frivolous, that the counsel who procured their original insertion omitted them in framing the points for the argument at bar. He raised, however, 26 points for our consideration, out of the multitude and variety contained in the bill ; and a great part of the business of the able counsel, who finally appeared on the argument, was de- voted to abandoning them one after another, till they came down to three, which certainly deserved consideration ; two of them presenting questions of a good deal of nicety. The attorney general, in his reply, read thirty-five of the points presented by the bill, and remarked, I am sorry to say, not without a cause, that exceptions to the admission of testimony had been multiplied there in proportion to its obvious pro- priety and admissibility. The counsel whose duty it was to draw up and attend the settlement of the bill, should not have insisted on the insertion of those exceptions, which he must, on reflection, have seen, were obviously unfounded, or irrele- vant. We need not say the interests of his client did not de- mand it. The fear is that such a practice may not only ob- scure the presentation of strong points in the bill, and which the counsel and the court below may feel desirous to put in the best shape for a review ; but detract from their final conside- ration. The attention of all must be drawn more or less to

immaterial matters; that attention which should be reserved for things of real moment.

I refer again to the doctrine laid down by Mr. Justice Nelson in *The People* v. *Haynes*, 11 Wendell, 561, 2, to which we mean to adhere. Allow me to add, that it is never the office of a bill of exceptions to draw in question the sufficiency of the whole or any part of the evidence in a cause unless a direction be given upon it, or a decision made in respect to it, as matter of law. *Willard* v. *Warren*, 17 Wend. 257, 260. Opinions of the judge upon its force and effect, whether they be given as to the whole or only certain parts of the evidence, are to be taken as merely advisory, if the cause be finally submitted to the jury. That he overrated its strength against the excepting party, or came short of its strength for him, so long as he treated it as of a merely persuasive character, can no more be settled on a bill of exceptions, than that the jury found against its weight. A great majority of the questions litigated in the progress of the trial depended for their solution upon circumstantial evidence. It is the business of the respective counsel, in such a case, to insist by way of argument to the jury, that certain facts will or will not warrant a given conclusion. He seeks to strengthen or diminish their force, when standing by themselves; and thence proceeds to consider their influence when regarded in connection with all the other testimony in the cause. In this proceeding there is commonly a good deal of collision between counsel. The judge is called to notice the points of difference, or such as he deems material; and he does so in his charge to the jury, with whom the decision is left; and which must in the nature of things be final.' In short, the jury are the tribunal to correct the errors, in point of fact, both of the judge and counsel. It cannot be done by writ of error.

I admit that error lies where testimony is received which appears to have been plainly irrelevant. But it will at once occur to every one accustomed to trials upon circumstantial evidence, how extremely difficult it is to establish a case of irrelevancy. The counsel on either side have a right to announce, in opening, or by way of proposition in the course

of the cause, that they will prove certain facts which are material to make out their case or any part of it; and the very announcement makes all those facts material, for the time being. They continue to be deemed material, until the judge finds the proofs are so far short of the proposition, that it is not fit to go to the jury. If the proposition be, in the judge's opinion, made out in a stronger or weaker sense, by all or any of the consecutive proofs which are produced, it goes to the jury. Propositions of this kind multiply in the course of the cause, and in the result are continually calling out evidence to discredit or corroborate witnesses, to fix dates, and correct inaccuracies of various kinds. Circumstances, though remote and of doubtful bearing, are receivable for the consideration of the jury; and a very wide scope is often thrown open for inquiries which, at first, would have been unintelligible. In this manner, the road of evidence in the case at bar seems to have gradually widened to a very large field of inquiry. It was sought to show that a system of forgery had been prosecuted by the prisoner against a whole community, and for a while with such success, that he was enabled, on the credit which it brought him, to sustain an immense business. Of that system, it was contended, the particular note in question with the eleven forged endorsements made a part; the prisoner's counsel strenuously contending, among other things, that however extensive the forgeries, his business was so much more extensive, and so little under his own eye, especially in its financial departments, that the forgeries, if any, had been volunteered by agents without his observing the fact. Such an extraordinary defence, warranted an inquiry into his whole business, and all the correspondence connected with it. His very habits of thought and action were entered upon, through questions put by his counsel. And he still persevered, in the face of eight endorsers swearing to the forgery, and confirmed by numerous circumstances, in denying that any forgery had ever been committed. He sought by cross-examination in respect to their connection with him as real endorsers in various cases, to confound their memories, to raise discrepancies as to time, the char-

acter of handwriting, and other collateral matters. He showed that several of them were his active enemies. He sought to contradict them by their conduct and declarations; and to convince the jury that they swore falsely. But in a long career of continued attempts at impeachment, he was unable to call a single witness from among a large community, who would deny that he believed the endorsements or any one of them to be forged; a community well acquainted with the individuals whose names were alleged to be forged; most of whom being business men, and their handwriting extensively known at Buffalo. Yet because the judge mentioned to the jury this weak point in the prisoner's case, and told them it was a circumstance which strengthened the proof of the forgery, an exception was taken, and even persevered in to the bar; and one of the counsel made a point, that the judge's opinion should not be given to the jury—that such negative evidence, or indeed any other, tended strongly to complete the proof of the forgery. But see per Best, J. in *Rex* v. *Burdett,* 4 Barn. & Ald. 121, *et seq.* and Holroyd, J. id. 141. Whereas, it is important in these circumstantial cases above all others, that the judge, who is a man of legal knowledge, and great experience in trials, should go through with the proofs in his charge, separating the chaff from the grain; and pointing out to the jury, as far as the imperfection of human language will enable him to do, the individual, the relative and collective weight of those proofs which are material. In omitting to do this, he would be guilty of a great neglect of duty. He is, in general, more collected and calm, and less open to the influence of popular sentiment than the jury; and in many cases, miserable would be the condition of prisoners, if the power which is questioned should be denied. How many innocent men, already doomed by public opinion, have been saved from the scaffold, by the firm and bold opinion of the judge, which seeks to avoid every thing extraneous, and base itself upon the law and the evidence; the *law* which commands him to act not only as its just, but its *humane* minister. It is equally important to the public, that he should frankly give his opinion to the jury

The People v. Rathbun.

upon the evidence which bears against the prisoner. Excluded personally from the concerns of commercial life, he is less interested in a severe pursuit of the man whose crime has struck at its existence, than perhaps any jury that can be impanneled ; while the tenure of his office was intended to place him beyond the attacks of political power, on the pretence that he may have been too lenient in the conduct of state prosecutions. He is, therefore, the safest possible instructor of the jury, both as to the law and the evidence. Indeed the act of estimating the weight of the latter, is but an application of the law to the proofs. An attempt to test the accuracy of such estimate by a bill of exceptions, must be attended with the want of many things before the judge and jury at the trial, which can never be presented by a bill. Having the witnesses and original evidence before him and the jury, with all the requisite explanations and other means of elucidation which attend a trial, he is peculiarly fitted to give proper directions. His words and phrases at the trial cannot be measured, and reversed or affirmed, accordingly as they may seem to be a little more or a little less than the paper standard warrants, as made out in a bill of exceptions. It is impossible to present them literally and as a whole with all the matters to which they relate ; and if otherwise, there is no precise legal standard by which they can be tried. For that reason the judge and jury are made the standard. The law confides to them a discretion, as it does in many things, with which a court of error cannot interfere, without a subversion of their power. From this doctrine the just and upright man has less to fear than from any presentation of his case which can be made on paper. Indeed, any remedy at all by bill of exceptions, is very recent ; and to this day it is, I believe, disallowed in most common law countries. The decisions of the court having original jurisdiction, both as to law and fact, are there absolutely final ; and were so for centuries under our own system. Not even a new trial could be granted, on an erroneous conviction of any crime above the degree of misdemeanor. *The People* v. *Comstock,* 8 Wendell, 549 ; and said in *Rex* v. *Ball,* Russ. & Ry. Cr. Cas.

132, 133.   The alteration by our statute does not go beyond introducing the bill to the same extent as in civil cases, where the law never has allowed an examination of the facts with a view to their weight in the scale of evidence.

My opinion is, that the judgment of the court below should be affirmed.

Judgment affirmed.