## E. L. Dreeben v. The State.

### No. 2266.    Decided April 30, 1913.

### Rehearing denied June 27, 1913.

**1.—Forgery—Confederate Pension Warrant—Indictment—Indorsement—Non-negotiable Paper.**

Where the alleged written instrument was a Confederate pension warrant and the forgery was alleged to consist in defendant's signing and forging the names of the payees on the back of said warrant, the false indorsement so made would, if the same were true, have created a pecuniary obligation, whether said warrant was negotiable or non-negotiable, and was, therefore, the subject of forgery, and the indictment being otherwise sufficient, there was no error in overruling a motion to quash.

**2.—Same—Pleadings—Rule Stated.**

The trend of modern decisions is to look rather to the substance than to the form that such instruments may take, and in latter times, the niceties

of pleading in prosecutions for forgery have not always been recognized. Following Forcy v. State, 60 Texas Crim. Rep., 209.

### 3.—Same—Case Stated—Counter Signature.

Where the said warrant was a Confederate pension warrant, the alleged forged indorsement of the name of payees in blank did affect the legal status of the paper, although it was not countersigned by the State Treasurer and though the same may not have been negotiable under the terms of the law.

### 4.—Same—Statutes Construed—Appropriation.

Under the various acts affecting the issuance of Confederate pension warrants, the General Appropriation Act of the Legislature making the appropriation therefor, entirely superseded the former Act of Appropriation, so that the Comptroller, in issuing the pension warrant, properly stated therein that the money was to be paid out of the appropriation of said general Appropriation Act, and this did not invalidate the indictment.

### 5.—Same—Pension Warrants—Other Warrants.

It is perfectly apparent by the provisions of the several acts affecting the issuance of Confederate pension warrants that the Legislature intended to make, and did make, a distinction of pension warrants from any and all other pay warrants issued by the Comptroller, and it was not necessary that the State Treasurer should countersign them so as to make them valid and payable, and the indictment was not insufficient on this ground.

### 6.—Same—Negotiable Paper—Indictment.

The Comptroller, under the power and authority given him under the law, was not prevented from making a Confederate pension warrant negotiable, or at least, quasi-negotiable, on account of the manner in which these warrants were issued under the law to the various pensioners throughout the State, it being practically impossible for the holders of these warrants to present them in person at the Treasury for payment, and the indictment was not defective on this ground.

### 7.—Same—Indorsement—Sufficiency of the Indictment.

Under article 933, Penal Code, in connection with other articles of said Code on the subject, it is forgery to make, with intent to defraud or injure, a written instrument by filling up over a genuine signature or by writing on the opposite side of a paper so as to make the signature appear as an indorsement, and the false indorsement of the payees' names on a Confederate pension warrant would come within the scope of forgery as set out in the indictment.

### 8.—Same—Rule Stated—Forgery Defined.

The false instrument must be such as, if true, would be of same real or legal efficacy, that is, that it must either be in fact or must appear to be of legal validity, but it need not have both the appearance and the reality. Following King v. State, 42 Texas Crim. Rep., 108, and other cases.

### 9.—Same—Case Stated—Indictment.

Where the forgery alleged was the false indorsement of the names of the payees on a certain Confederate pension warrant, it was immaterial whether said warrant was negotiable or non-negotiable, and said indorsement, as set out in the indictment, was the proper subject of forgery, and defendant's motion to quash the indictment on this ground was properly overruled.

### 10.—Same—Sufficiency of the Evidence.

Where, upon trial of forgery of the indorsement of a certain Confederate pension warrant, the evidence sustained the conviction, there was no reversible error.

**11.—Same—Evidence—Affidavits—Warrant.**

Where, upon trial of forgery of the indorsement of the payees on a certain Confederate pension warrant, the court admitted in evidence certain forged affidavits in connection with said warrants, all of which were properly indentified, there was no error.

**12.—Same—Charge of Court—Affidavits—Warrants.**

Where, upon trial of forgery of an indorsement upon a certain Confederate pension warrant, certain affidavits which were necessary to procure said warrant, which were also forged, were admitted in evidence, there was no error in the court's charge instructing the jury of what effect and for what purpose the said affidavits were admitted in evidence.

Appeal from the District Court of Travis. Tried below before the Hon. Geo. Calhoun.

Appeal from a conviction of forgery; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*Warren W. Moore,* and *Gregory, Batts & Brooks,* and *Israel Dreeben,* for appellant.—The treasury warrant, upon the back of which it is alleged in the indictment that the appellant falsely wrote, by way of indorsement in blank, the names of W.° W. Montgomery and J. W. Moore, is an incomplete instrument in writing, as appears from its face, in reference to which forgery can not, in any manner, be lawfully charged, and particularly no indorsement in blank of such instrument will amount to forgery. Leach v. Wilson County, 62 Texas, 331; Dana v. City of San Francisco, Cal., 19 Cal., 486; Merlin v. Manning, 2 Texas, 351; Ross v. Smith, 19 Texas, 171; Merrill v. Smith, 22 Texas, 53; Gregg v. Johnson, 37 Texas, 558; Art. 583, title 16, Rev. Civ. Stat., 1911; Anderson v. Harvey, 39 Texas, 123; Terrell v. Sparks, 104 Texas, 191, 135 S. W. Rep., 519; Sayles' Rev. Stat., art. 2831; Costley v. State, 14 Texas Crim. App., 156; Crayton v. State, 73 S. W. Rep., 1046; Crayton v. State, 80 S. W. Rep., 839; Act of March 26, 1909, Regular Session, 1909, p. 231; General Appropriation Act, Second Called Session, 1909, p. 514.

On question that indictment is insufficient upon other grounds set out in the opinion: Womble v. State, 44 S. W. Rep., 827; Cagle v. State, 44 S. W. Rep., 1097; Polk v. State, 51 S. W. Rep., 909; Horn v. State, 9 Texas Crim. App., 838; Strang v. State, 22 S. W. Rep., 680; Carter v. State, 55 Texas Crim. Rep., 43, 114 S. W. Rep., 839; White's Penal Code, art. 531, and form under same.

On question of admitting in evidence the affidavits and alleged warrant: Baker v. State, 14 Texas Crim. App., 332; White v. State, 3 id., 605; Fischl v. State, 54 Texas Crim. Rep., 55, 111 S. W. Rep., 410; Crayton v. State, 73 S. W. Rep., 1046; Crayton v. State, 80 S. W. Rep., 839; Taylor v. State, 50 Texas Crim. Rep., 381, 97 S. W. Rep., 474; Pelton v. State, 60 Texas Crim. Rep., 412, 132 S. W. Rep., 480; Carden v. State, 62 Texas Crim. Rep., 545, 138 S. W. Rep., 598.

On question of insufficiency of the evidence:   Pogue v. State, 12 Texas Crim. App., 283.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was convicted of forgery and his penalty fixed at three years in the penitentiary.

The indictment is attacked on several grounds.   After the necessary and usual formal allegations the indictment alleges as follows:   "That E. L. Dreeben in said county and State, on or about the 1st day of June, in the year of our Lord Nineteen Hundred and Eleven, and before the presentment of this indictment, did then and there without lawful authority, and with intent to injure and defraud, wilfully and fraudulently make a certain false instrument in writing purporting to be the acts of others, towit, purporting to be the act of W. W. Montgomery and J. W. Moore by then and there writing on the back of a treasury warrant of the tenor following, towit:

No. 23622.                    TREASURY WARRANT.                    $24.00.

Comptroller's Office,
Austin, Texas, June 1, 1911.

The Treasurer of the State of Texas will pay to the order of W. W. Montgomery out of any money appropriated by Act of Friday, May 28, 1909, twenty-four dollars, in payment of your pension for the quarter ending May 31, 1911.

W. P. Lane,
Comptroller.

. . . . . . . . . . . . . . . . . . .
State Treasurer.

☞COPY.
APPROPRIATION NO. 565 S.
CONFEDERATE PENSION WARRANT.

(Indorsed across the back of it:)   "W. W. Montgomery, J. W. Moore" (the latter right under the former name).   The names of W. W. Montgomery and J. W. Moore so as thereby to make said writing appear as an endorsement of the said treasury warrant by the said W. W. Montgomery and the said J. W. Moore and in such a manner that the said false endorsements so made would, if the same were true, have created a pecuniary obligation and have transferred said treasury warrant. It will be seen that the forgery is alleged to consist in appellant's signing and forging the names of said Montgomery and Moore, indorsed by him on the back thereof.

This court, through Judge Ramsey, in Forcy v. State, 60 Texas Crim. Rep., 209-10, correctly and aptly held:   "There is in the books much curious learning on the subject of forgery, and the office of the tenor and purport clauses in the indictment for this offense have been

refined upon by courts until it is sometimes difficult for one to grasp and comprehend the office of either, and these refinements have sometimes, it seems to us, gone to the extent of overshadowing and dwarfing the substance of the matter required to be alleged. What instruments may be the subject of forgery has also quite frequently received judicial interpretation. These instances and illustrations are numerous and not always wholly consistent. We think in later times the niceties of pleading in prosecutions for forgery have not always been recognized; that the trend of modern decisions is to look rather to the substance than to the form that such instruments may take. We can not be unmindful of the fact that with the progress of civilization and the frequency in commerce with which business is transacted by notes, bills, and letters of credit, that it is essential to the protection of the citizen and the integrity of commerce, that a reasonable and sensible rule in prosecutions for forgery should be established. In olden times trade was either a matter of barter or for money in hand. In these times, as we know, but a small per cent of commercial transactions are carried on and completed in any other form than by note, bond, checks, orders and drafts. While having due regard for the safety of the individual citizen who may be prosecuted for forgery of any of the manifold instruments conveying or undertaking to convey moneys and property, it is essential that at least some fair regard shall be had to the protection of the great body of our people who are interested in the honesty and integrity of these instruments."

Among the grounds contesting the validity of this indictment, the material ones, we think, are, in substance, that said warrant is not negotiable and the forged indorsement of the name of the payee in blank on the back in no way changes or affects the legal status of the paper and in no way affects it or constitutes evidence of a valuable right. That it is not countersigned by the State Treasurer and for that reason is incomplete which is apparent on its face. That the Comptroller had no power to draw the warrant to the order of the payee and thereby make, or attempt to make, it negotiable. And that instead of showing that the warrant was to be paid out of money appropriated by the Act of May 28, 1909, should have referred to the Act of March 26, 1909.

The Act of March 26, 1909, page 231, passed at the regular session of the Thirty-first Legislature, and the Act of August 19, 1910, page 37, regulating the duties of the Comptroller in the issuance of such warrants, and the Act of May 12, 1909, passed at the regular session of the Thirty-first Legislature, regulating the duties of the State Treasurer as to such warrants, were in force at the time of the issuance and alleged forgery of this warrant. By the said Act of March 26, 1909, appropriating $500,000 for the respective years, beginning September 1, 1909, and ending August 31, 1910, and beginning September 1, 1910, and ending August 31, 1911, from which payment of the Confederate pensions could be made, this Act and none of it, took effect until ninety days after March 26, 1909. Before this part of the Act of March 26,

1909, appropriating said money took effect, or the appropriation there-under became effective, the Legislature in the same regular session, passed the general appropriation Act, and by that general appropriation Act, page 514, it appropriated for said respective years the same said 'sum of $500,000. Under the constitutional provision, as it then was, the Legislature could appropriate only $500,000 for each of said respective years. There is no question but that the general appropriation Act was intended to be in lieu of, and was in lieu of, said appropriation made by the Act of March 26, 1909, and entirely superseded the prior Act. So that the Comptroller, in issuing the warrant, properly stated that the money was to be paid out of the appropriation of said general appropriation Act.

Section 25, page 41, and other sections of the Act of August 19, 1910, prescribing the duties of the Comptroller in issuing all pay warrants, prescribes minutely what shall appear in the face of such warrants, but expressly therein "excepts claims for pension therefrom." And in section 26, page 42, subdivision 3, expressly provides "the forms for pensions (pension warrants) shall be prescribed by the Comptroller and shall be uniform in size, arrangement, matter and form." And again, in the same Act, section 30, page 43, in order to show that pension warrants shall not contain on their face all of what other warrants provided for shall contain, expressly again enacts: "Applications for pensions and the issuance of pension warrants shall not be subject to the provisions of this Act." Then again, section 7, page 233, of said Act of March 26, 1909, after regulating how and when the Comptroller shall issue pension warrants, enacts: "The Comptroller of Public Accounts shall draw his warrant to the amount of such pension on the Treasurer, and upon presentation the Treasurer shall pay the same out of any money in the treasury which may be appropriated to this purpose." And in section 15 of said Act, page 234, it is again enacted: "And the Comptroller shall issue his warrant for the amount due said pensioner in the manner hereinbefore provided for, all pensioners to be paid at the end of each quarter and shall begin on the first day of September and March after the filing and establishment of the application herein provided for."

It is perfectly apparent by the provisions in said several Acts and the general trend of our laws on the subject, that the Legislature intended to make, and did make a distinction of pension warrants from any and all other pay warrants issued by the Comptroller. And from all this it is our opinion that the Legislature did not intend that the Treasurer should countersign these pension warrants so as to make them valid and payable; or, in other words, that they were perfectly valid and the Treasurer required to pay them without his previously countersigning them before the Comptroller sent them out.

The evidence in this case clearly and without contradiction shows that the Comptroller and Treasurer construed and acted upon the law, as stated above. We know as current history of this State, and by the

legislation on the subject, that the Confederate pensioners are scattered all over, and in most, if not every, county in this State. The Treasurer testified that there were about 12,500 of them and that about that number of pension warrants were to be issued every quarter to pay them, and that the Comptroller's department, who issued the warrants, could not wait until the first day of the quarter to write up and mail out the pension warrants. That the pension warrants are mailed out by the Comptroller's office and paid when presented to his department, the Treasurer's office. Mr. Beauchamp, who was an employe and clerk in the Comptroller's department at the time the said warrant in this case was issued and who issued it, testified that the original warrant in this case, which was at the time he was testifying in his hands, was a pension treasury warrant and that such paper as that was cashed at the Treasurer's office when presented for that purpose. That he, as such official in the Comptroller's office, got up all pension warrants at that time and particularly the one in this case; that there were something near. 12,000 such warrants to be sent out every quarter and that they began starting them out about six weeks before they were dated; that they were dated the date they were supposed to be collected, but they mailed them out as soon as possible so the pensioners could get them and get their money on them by the date of payment.

We know of no law, and have been unable to find any, after the most diligent search, and appellant has cited us to none, which shows that the Comptroller, under the power and authority given to him, is prevented from making them negotiable, or, at least, quasi negotiable. Our Supreme Court in Leach v. Wilson County, 62 Texas, 331, in discussing the character of a warrant properly allowed and issued by Wilson County upon the county treasurer, as to such warrants said: "When a claim has been presented and allowed, and a warrant upon the treasurer has been drawn in accordance with the order of allowance, while the order of the county is primary evidence of the right, yet the warrant is something more than a mere voucher; it is prima facie evidence of an existing and matured debt, which throws the burden upon the county to repel by showing the want of consideration or some other valid defense. Burroughs on Public Securities, p. 638, and authorities, note 2." We can see no good reason why such warrants should not be made negotiable or quasi negotiable. As stated above, we know as current history and by the legislation on the subject, even without the testimony in this case, that the 12,000 or more .Confederate pensioners are in almost, if not every county in this State. The largest amount at the time of the issuance of the warrant in this case which could be issued to any of said pensioners was $24. Most of the warrants issued were for less amounts. It would be entirely impracticable, if not impossible, for the holders of these pension warrants when they receive them to come to the City of Austin and present such warrants to the Treasurer in person for payment. "In these times, as we know, but a small per cent of commercial transactions are carried on and

completed in any other form than by note, bond, checks, orders and drafts." (Forcy v. State, 60 Texas Crim. Rep., 206.) So in this case, we know that such pension State warrants as were issued in this case are cashed and collected through the banks and other like instrumentalities by the pensioner and that he indorses simply and solely his name on the back of such warrant, and that through that channel, and practically through that channel alone, such warrants are cashed by the State Treasurer on presentation to him for payment. As illustrating this, the warrant in this case was so presented and cashed by the State Treasurer. The business of issuing, collecting and having paid such warrants in such manner could hardly otherwise be conducted. So that in this case, this warrant having been issued in a negotiable form by the Comptroller, if it had reached the payee thereof and he had indorsed simply his genuine signature on the back thereof and delivered it to any bank or other person, it would thereby have evidenced the prima facie if not the real transfer thereof to such banker or other person, and we think there is no question but that anyone in possession of such warrant who forged the name of such payee on the back, as was done in this instance, would have been guilty of the forgery thereof, and there is no question but that such indorsement under such circumstances would in, at least, some "manner have affected said property." (P. C., art. 924.) And that such indorsement, if genuine, would have transferred or in some manner, at least, have affected property and that such indorsement would unquestionably have indicated and supposed a right in the person purporting to execute it to dispose of or affect the same. (P. C., art. 931.)

As prescribed by our statutes under which this prosecution and conviction was had: "He is guilty of forgery who, without lawful authority, and with intent to injure or defraud, shall make a false instrument in writing, purporting to be the act of another, in such manner that the false instrument so made would (if the same were true) have created, increased, diminished, discharged or defeated any pecuniary obligation, or would have transferred, or in any manner have affected any property whatever." " 'Pecuniary obligation' means every instrument having money for its object, and every obligation for the breach of which a civil action for damages may be lawfully brought." (P. C., art. 930.) "By an instrument which would 'have transferred or in any manner have affected' property, is meant every species of conveyance, or undertaking in writing, which supposes a right in the person purporting to execute it, to dispose of or change the character of property of every kind, and which can have such effect when genuine." (P. C., art. 931.) And "it is forgery to make, with intent to defraud or injure, a written instrument, by filling up over a genuine signature, or by writing on the opposite side of a paper so as to make the signature appear as an indorsement." (P. C., art. 933.)

What character of perfectness or imperfectness is necessary to be shown on the face of a claimed forged document, has many times been

before this court and well considered and thoroughly discussed. In the case of King v. State, 42 Texas Crim. Rep., 108, this court through Presiding Judge Davidson, discussed and cited authorities and announced the law so clearly and tersely thereon, we can do no better than to here quote, as applicable to this case, what he therein held and said, which we now do: "Mr. Bishop, in his work on Criminal Law, says: 'Sec. 533. The false instrument must be such as, if true, would be of some real or legal efficacy, since otherwise it has no tendency to defraud. In other words, it must either be in fact, or must appear to be, of legal validity, but it need not have both the appearance and the reality.' In support of this proposition he cites many authorities collated in note 5 under above section. In section 538 he says: 'A writing affirmatively invalid on its face can not be the subject of forgery, because it has no legal tendency to effect the fraud. Entering into this question is the distinction many times adverted to in these volumes, that every man is presumed to know the law, yet not to know the facts.' So it will be seen that the distinction is clearly drawn between knowledge of law and knowledge of fact. If the instrument is void on its face, it can not be the subject of forgery, but if valid on its face, though invalid as a matter of fact or under the proof, it would still be the subject of forgery. In section 541 the same author says: 'Since men are not legally presumed to know facts, a false instrument good on its face may work a fraud, though extrinsic facts show it to be invalid even if it were genuine. Therefore there may be forgery of such an invalid instrument.' In People v. Galloway, 17 Wend., 540, this language is found: 'There is a distinction between the case of an instrument apparently void, and one where the invalidity is to be made out by the proof of some extrinsic fact. In the former case the party who makes the instrument can not, in general, be convicted of forgery, but in the latter he may.' So with a fictitious person. 'From this doctrine of a seeming validity sufficing, though it is not real, we have the further result that if the person whose instrument the forgery purports to be is dead, or if he is a mere fictitious person, still, as the question of the existence of such a person is one of fact, not of law, and the instrument appears valid on its face, the offense is complete.' Bish. Crim. Law, sec. 543. In section 544: '(1) Restated, the ordinary doctrine is that, for the invalidity of the instrument to be a perfect defense, the defect must appear on its face to be good and valid for the purpose for which it was created. In another aspect: (2) Evidence of fact. The instrument must be such that if it were genuine it would be evidence of the fact it sets out.' We are not undertaking here to discuss instruments or writings uncertain on their face. So it has been held that, if there is a bare possibility that another may be imposed upon, a conviction will be sustained. State v. Dennett, 19 La. Ann., 395; State v. Gryder, 44 La. Ann., 962, 11 So. Rep., 573. 'It is immaterial whether the counterfeited instrument be such as, if real, would be effectual to the purpose it intends. If there is only a resemblance sufficient to impose upon those

to whom it is uttered, or to the public generally, it is sufficient.' 3 Chit. Crim. Law, 1035, 1039. 'It is not necessary to the offense that the instrument should be one which, if genuine, would be a binding obligation. It is sufficient that the instrument purports to be good. The want of validity must appear on the face of the paper, to relieve from the character of forgery.' 13 Am. & Eng. Ency. of Law, 2 ed., 1088; United States v. Turner, 7 Pet., 132, 8 L. Ed., 633. In the same volume (13 American and English Encyclopedia of Law) we find this language: 'As a general rule, any writing in such form as to be the means of defrauding another may be the subject of forgery, or alterations in the nature of forgery.' Page 1093, note 3, for collation of numerous authorities. 'The writing need not be such as, if genuine, would be legally valid. If it is calculated to deceive, and intended to be used for a fraudulent purpose, this is enough.' Notes 4 and 5, id., for authorities. An instrument valid on its face is equally the subject of felonious forgery or felonious uttering, though collateral or extrinsic facts, of whatever character, may exist, that would render it absolutely void if genuine.' Same authority, note 6, for authorities; People v. Rathbun, 21 Wend., 509; People v. Galloway, 17 Wend., 540; Russ. on Crimes, 317-328; State v. Johnson, 26 Iowa, 407; State v. Hilton, 35 Kan., 338, 11 Pac. Rep., 164; State v. Pierce, 8 Iowa, 231. To the same effect is Anderson v. State, 20 Texas Crim. App., 595; and it follows the rule laid down by Mr. Bishop, supra. In view of these authorities, it will hardly be necessary to discuss the question further. If they are correct, this instrument is clearly the subject of forgery."

Again, in the case of Wheeler v. State, 62 Texas Crim. Rep., 370, this court through Judge Harper, held: "In the case of Costley v. State, 14 Texas Crim. App., 156, it is held: 'There can be no doubt but that a bail bond, executed for the appearance of a party to answer before the proper court an accusation against him of an offense against the law, is a pecuniary obligation to the State, binding upon him and his sureties, and is one which, by the very terms of the law permitting it, can be enforced in case of a breach of its conditions. (Code of Criminal Procedure, arts. 282 et seq., and arts. 400 et seq.) If an instrument in writing which creates a pecuniary obligation is a subject of forgery, then a bail bond is also such an instrument as may be the subject of forgery. (Penal Code, art. 435; Com. v. Linton, 2 Va. cases, 476.) It is not necessary that a bail bond should have been forfeited or attempted to be forfeited before it is the subject of an assignment and prosecution for forgery, for 'an instrument falsely made with intent to defraud is a forgery, although, if it had been genuine, other steps must have been taken before the instrument would have been perfected, and these steps are not taken.' (Com. v. Costello, 120 Mass., 358.) See also Morris v. State, 17 Texas Crim. App., 660; Dooley v. State, 21 Texas Crim. App., 549; Lassiter v. State, 35 Texas Crim. Rep., 540; State v. Gullette, 121 Mo., 447, and notes cited in 8 Am. St. Rep., 467. And in Cyc., volume 19, page 1384, the rule is laid down in speaking of

forgery: 'A paper is not invalid on its face because certain steps have not been taken,' citing Com. v. Wilson, 25 Am. St. Rep., 528; Com. v. Costello, 120 Mass., 353; State v. Gee, 42 Pac. Rep., 7; Foute v. State, 75 Lea, 712, and other cases." Again, this court, through Judge Harper, in another recent case, Horn v. State, 150 S. W. Rep., 948, quoting from Mr. Wharton, said: "Mr. Wharton, in his work on Criminal Law, section 739 et seq., lays down the rule that it is only necessary in order to make the instrument a subject of forgery that it should be capable of being used as proof in a legal action."

Appellant presses and persistently urges that the said warrant was non-negotiable and cites many authorities on that point, and, based on his contention that the warrant was not negotiable, he vigorously contends that the forging of the name by appellant of the payee, by indorsement on the back thereof, can not be forgery. We can not agree to this contention. Unquestionably the law is that a non-negotiable instrument can be forged as well as a negotiable instrument. The fact, if it be so, that in order to maintain a suit in the civil court on a non-negotiable instrument by an indorsee thereof, proof in addition or other than the mere indorsement in blank by the payee might be necessary, yet, even if that should be so, the indorsement by the payee would certainly be at least one link of the evidence to establish the transfer or assignment thereof to the holder in possession. And such indorsement of a non-negotiable instrument would be some evidence which supposes a right in the person purporting to execute it to dispose of the same, and so would the writing and indorsing of the name by the payee thereof affect the paper so as to make the signature appear as an indorsement thereof. We think clearly under the statute that whether the warrant be held negotiable or non-negotiable, that the forged indorsement of the payee's name on the back, amounts to forgery.

So that whether the warrant is held to be negotiable or non-negotiable, there can be no question but that the said warrant, in the condition it was, if indorsed by the genuine signature of the payee thereof was capable of deceiving and unquestionably did deceive and was the subject of forgery, as alleged in the indictment herein. In this case, the evidence demonstrates, without contradiction, that the warrant as issued and the forged indorsement of the payee's name thereon, not only deceived the bank through which it passed, but the State Treasurer himself, who paid and cashed it when it was presented to him for that purpose in the condition it was.

In our opinion the said indictment was perfectly legal and valid and none of appellant's objections thereto were good, and that all that was necessary or proper to be alleged in the indictment was sufficiently alleged.

The evidence in this case was uncontroverted. There was no conflict therein. The appellant offered no evidence whatever. It authorized the jury to believe and find, if it did not unquestionably fully establish, that for some time prior to June 1, 1911, on which this forgery is

charged, appellant was a clerk or at work in the Pension Commissioner's office of this State and daily came in contact, because thereof, with the Comptroller's department in the issuance of pension warrants; that the W. W. Montgomery in whose favor this warrant purported to be issued for many years prior to his death, lived at Ennis, Ellis County, Texas, and prior to his death he was one of the Confederate pensioners and had drawn a pension quarterly for some time prior to his death; that he never lived at San Antonio; that he died July 5, 1910; that in order for any pensioner to get a pension quarterly the law required that on or after the first of each quarter such pensioner make an affidavit, stating the county of his residence and his postoffice address, and that he was the identical person to whom a pension had been granted under the law and that the conditions which existed at the time of making the application and on which the pension was granted still exist, and that his said affidavit shall be supported by the affidavit of some other credible person to the same facts. That such affidavits shall be filed with the Pension Commissioner for examination and if approved it shall be furnished to the Comptroller and on the basis of it the Comptroller should draw his warrant on the Treasurer for the amount of such quarterly pension. That the appellant forged both of such affidavits and as an official from the Pension Commissioner's office presented them to the Comptroller and had the Comptroller to issue said warrant. That after the issuance of said warrant it in some way—not made clear how by the evidence,—went into the hands of the appellant and that he thereupon forged the indorsement of the name of the payee thereof and of J. W. Moore, and that thereafter based on said indorsements, the warrant was presented to the Treasurer for payment and he paid the same. In addition, the evidence tends to show and was sufficient for the jury to believe therefrom that on June 1, 1911, at which time he is charged with said forgery appellant fled from Austin, in Travis County, where he then lived and where his duties called him to be; that the sheriff of Travis County on that date diligently hunted for him but could not find him in Travis County and did not find him until some day or two later when he was arrested and incarcerated by the sheriff of Tarrant County, Texas, in Fort Worth, when the sheriff of Travis at once went, received him and brought him back to Travis County under arrest; that upon his arrest in Fort Worth there was procured from off his person or in his baggage a bank deposit book of one of the banks of Austin, Texas, the entries in which tended to show incriminating evidence in connection with the forgery charged herein; that that night in the sleeper on the trip from Fort Worth to Austin, appellant surreptitiously and without the knowledge and consent of the Travis County sheriff, purloined the said bank book, and made way with it; that although the sheriff diligently searched therefor and had searches made all up and down the railroad over which they traveled that night, he could never find that book. Taken as a whole, we think, the evidence, while it might have been strengthened on some points by the State, was sufficient to sustain the verdict.

The court did not err in admitting, over·the appellant's objections, the said forged affidavits and warrant. They were clearly identified, pro-·duced, shown to be forged·by appellant, and were clearly admissible in evidence.

The charge of the court of what effect and for what purpose the said forged affidavits were admitted and could be used in evidence, properly, fully and correctly instructed the jury, and it was necessary and proper for the court to give the instructions and restrictions for what such testimony could be used and that ·it could not be the basis of a conviction of the appellant for the forgery of said warrant.

We have carefully read and studied this case and the brief and oral argument by appellant's able attorneys and all of the points raised, urged and discussed by them. We find no reversible error in this ·case. The judgment will, therefore, be affirmed.

*Affirmed.*

[Rehearing denied June 27, 1913.—Reporter.]

DAVIDSON, JUDGE, dissenting.